UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL SHERMAN,                  )                    Civil No. 05-11545-NG
    Plaintiff                       )
    v.                              )
VISION LAB TELECOMMUNICATIONS, )
    INC., et al.,                   )
    Defendants                      )

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO VISION LAB'S 12(b)(6)
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

The Plaintiff respectfully submits this memorandum in opposition to Defendant

Vision Lab's motion to dismiss the complaint herein pursuant to Fed. R. Civ. P. 12(b)(6)

for failure to state a claim upon which relief can be granted.

REQUEST FOR ORAL ARGUMENT

The Plaintiff requests that the court set this motion down for oral argument.

SUMMARY OF ARGUMENT

The Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, [1] (the TCPA)

provides a private right of action to recover damages for *each violation* of the TCPA

itself or of a regulation promulgated by the FCC under the authority granted to it by

Congress in the TCPA. The FCC's regulations requiring identification of fax senders and

fax broadcasters were promulgated pursuant to that authority. Consequently, a private

right of action *does* exist for violation of those regulations.

Contrary to the Defendant's argument, Massachusetts *may* forbid interstate telephone

solicitations and facsimile advertisements directed to its residents, and it has done so.

---

[1] Citations to the TCPA in this brief are to the subsections and paragraphs of the law as it was amended by
the so-called Junk Fax Prevention Act of 2005, Pub. L. No. 109-21, 119 Stat. 359 *et seq.* (eff. July 9, 2005).
Except as otherwise noted, all portions of the TCPA cited herein were in effect on the date of the
advertisements complained of in this action.

Consequently, the complaint states a claim for relief under the Massachusetts

Telemarketing Solicitation Law, Mass. Gen. L. c. 159C, §§ 1 *et seq.* (the MTSL).

If the Plaintiff prevails under his TCPA claims, he is entitled to recover attorney's

fees because a TCPA violation is a *per se* violation of Mass. Gen. L. c. 93A, § 2. If he

prevails under his MTSL claims, he is entitled to recover attorney's fees under Mass.

Gen. L. c. 159C, § 8(c).

## ARGUMENT

In ruling on a motion to dismiss, the court must accept the well-pleaded facts stated in

the complaint, together with all reasonable inferences therefrom, as true. *See, e.g.,*

*TAG/ICIB Servs. v. Pan Am. Grain Co.,* 215 F.3d 172, 175 (1st Cir. 2000). "A motion to

dismiss is only allowed where it is clear that the plaintiff can prove no set of facts to

support his or her cognizable claim." *Charles v. City of Boston,* 365 F. Supp. 2d 82, 87

(D. Mass. 2005), *citing Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). *See also*

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512-513 (2002) (reaffirming notice pleading

standard of *Conley v. Gibson*); *Educadores Puertorriquenos En Accion v. Hernandez,*

367 F.3d 61, 66 (1st Cir. 2004) (acknowledging that heightened pleading requirements

exist only when a statute or rule specifically creates them). Tested by this lenient

standard, and even having regard for Vision Lab's contemporaneous 12(e) motion for a

more definite statement, the complaint in this case passes muster with ease.

To survive this motion, the Plaintiff need only show that he might prove a right to

relief under any cognizable legal theory. His amended complaint alleges facts that, if

proven, would make out violations of several sections of the TCPA and of the MTSL.

The TCPA and FCC regulations thereunder prohibit the transmission of unsolicited

advertisements ("junk" faxes) by facsimile. *See* 47 U.S.C. § 227(b)(1)(C); 47 C.F.R. § 64.1200(a)(3). Someone who transmits messages to telephone facsimile machines on behalf of someone else for a fee is a "fax broadcaster" and is liable for violating the junk fax prohibition if he "demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions." 47 C.F.R. § 64.1200(f)(4) & a(3)(ii). The federal do-not-call rule prohibits telephone solicitations to persons on the do-not-call list or between the hours of 9:00 p.m. and 8:00 a.m. local time. 47 C.F.R. § 64.1200(c); 16 C.F.R. § 310.4(b)(1)(iii)(B) & (c).[2] FCC regulations require the senders of facsimile messages (whether they be advertisements or not) to provide certain identification in the top or bottom margin of each page or on the first page. 47 C.F.R. § 68.318(d). The regulations further require that a highly involved fax broadcaster identify itself by name on each message. *Id.* Finally, FCC and FTC regulations require that persons engaged in telemarketing transmit caller identification information. 47 C.F.R. § 64.1601(e); 16 C.F.R. § 310.04(a)(7).

It is against Massachusetts law to make unsolicited telephonic sales calls by fax in the first place. *See* Mass. Gen. L. c. 159C, § 3(iii); 201 C.M.R. § 12.02(3). It is likewise illegal to make such calls to a number on the Massachusetts do-not-call list or between 8:00 p.m. and 8:00 a.m. local time. *See* Mass. Gen. L. c. 159C, § 3(i) & (ii); 201 C.M.R. § 12.02(1) & (2). It is illegal for a telephone solicitor to intentionally circumvent a consumer's use of caller identification. *See* Mass. Gen. L. c. 159C, § 4; 201 C.M.R. § 12.02(5).

---

[2] 16 C.F.R. § 310.4 is part of the Federal Trade Commission's Telemarketing Sales Rule (TSR). To sue under the TSR, the plaintiff would need to demonstrate actual damages exceeding $50,000. *See* 15 U.S.C. § 6104(a). Violations of the TSR are nonetheless *per se* violations of the Massachusetts Consumer Protection Act, Mass. Gen. L. c. 93A, § 2, and actionable under § 9 of that Act. *See* section V *infra*.

The Plaintiff has alleged the following facts bearing on these various legal theories. He has a fax machine connected to a telephone line. [Complaint ¶ 11].[3] *See* 47 U.S.C. § 227(a)(3) (definition of telephone facsimile machine). Between April 30, 2004 and December 15, 2004, he received more than 90 unsolicited advertisements on that fax machine. [Complaint ¶ 12] Some of those advertisements arrived between the hours of 8:00 p.m. and 8:00 a.m. [Complaint ¶ 14] None of the advertisements indicated the identity or location of the sender or the advertiser. [Complaint ¶ 15]. Vision Lab transmitted at least 55 of the 90 ads. [Complaint ¶ 18] Vision Lab had "substantial involvement" in many actionable activities, including "designing said advertisements, choosing the telephone numbers to which such advertisements were sent, controlling the information supplied in marginal headings on such advertisements, controlling the caller identification information supplied to common carriers during the transmission of such advertisements, contracting for so-called number removal services furnished by SUPPORT GROUP and other parties, and actually transmitting said advertisements." [Complaint ¶ 19]

The Plaintiff need say no more than this to survive a 12(b)(6) motion. Vision Lab has, however, extensively briefed several legal issues that might more appropriately be considered on a motion to strike under Rule 12(f) or on a summary judgment motion under Rule 56. In the interest of economy, therefore, and in recognition that those issues must eventually be decided at some point in this action, the Plaintiff will respond to each issue.

## I. THE PLAINTIFF HAS STATED A CLAIM FOR VIOLATION OF FAX IDENTIFICATION REQUIREMENTS

---

[3] References to the First Amended Complaint are cited as "[Complaint ¶ (number)]."

At the time of the alleged violations, the TCPA provided that "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States, … to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C), *as enacted by* Pub. L. No. 102-243, §3, 105 Stat. 2395-2396 (1991), *and amended by* Pub. L. No. 108-187, § 12, 117 Stat. 2717 (2003). Congress provided a private right of action to recover actual or statutory damages "based on a violation of this subsection or the regulations prescribed under this subsection". 47 U.S.C. § 227(b)(3). By "this subsection", one should (as Vision Lab quite properly argues on page 4 of its brief) understand § 227(b). Paragraph 227(b)(2) authorized the Federal Communications Commission to prescribe regulations to implement the requirements of "this subsection", namely § 227(b). Those "requirements" include a requirement that no person transmit an unsolicited advertisement by facsimile.

The Plaintiff alleged in ¶ 16 of his First Amended Complaint that Vision Lab and other defendants violated the provisions of, among other laws and regulations, 47 C.F.R. § 68.318(d). That regulation provides as follows:

[(1)] It shall be unlawful for any person within the United States to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual. [(2)] If a facsimile broadcaster demonstrates a high degree of involvement in the sender's facsimile messages, such as supplying the numbers to which a message is sent, that broadcaster's name, under which it is registered to conduct business with the State Corporation Commission (or comparable regulatory authority), must be identified on the facsimile, along with the sender's name. [(3)] Telephone facsimile machines manufactured on and after December 20, 1992, must clearly mark such identifying information on each transmitted page.

*Id.* (sentence numbering added).

The Plaintiff specifically alleged that "[n]one of said advertisements indicates the identity or location of the sender or the true name and location of the advertiser." A permissible inference from this allegation is that neither the advertisers nor the fax broadcasters responsible for the faxes are identified as required by the first sentence in the quoted regulation. Thus, the Plaintiff has sufficiently alleged violations of the identification requirements, and the court must assume for purposes of this motion that such violations actually occurred.

Vision Lab asserts, however, that the Plaintiff has no right to seek damages for violations of § 68.318(d)[(1)]. It argues that the identification requirements are contained in regulations that were promulgated "under" § 227(d) of the TCPA rather than § 227(b) or § 227(c), and that Congress deliberately omitted to give private citizens the right to sue "under" § 227(d). The Plaintiff agrees that there is no private right of action "under" § 227(d), but he says that is beside the point because there *is* a right of action for violation of the regulation.

When the FCC first adopted a rule requiring identification requirements for the senders of facsimiles, it purported to act pursuant to several sections of the Communications Act of 1934, namely 47 U.S.C. §§ 151, 154, 155, 201-205, 218, 227, and 303. *See* Report and Order, 7 F.C.C.Rcd. 8752, 8793 (FCC 92-443, Oct. 16, 1992) (hereinafter 1992 Order). The FCC did not derive its authority solely from § 227(d), as Vision Lab argues. Indeed, § 227(d)(2) is the only part of subsection (d) that mentions *regulations* affecting fax transmissions, and it merely requires the FCC to amend its technical and procedural standards to require that fax machines manufactured after a

certain date provide certain information in the margins. *Cf.* 47 C.F.R. § 68.318(d)[(3)]. Congress did not mandate that the FCC require by regulation that users of facsimile machines actually use the capability of their fax machines.

The case of *Lary v. Flasch Business Consulting,* 878 So.2d 1158 (Ala. Ct. App. 2003), cited by Vision Lab on page 5 of its brief, held only that there is no private right of action ***under 47 U.S.C. § 227(d)(1).*** *See* 878 So.2d at 1165. The *pro se* plaintiff, a physician, had not sought damages for a violation of the FCC regulation at issue in this case. *Condon v. Office Depot, Inc.,* 855 So.2d 644 (Fla. Ct. App. 2003), likewise involved an alleged violation of the ***statutory*** identification requirement. *See* 855 So.2d at 646. The Plaintiff had not pressed the issue on appeal. Because both cases involved violations of the statute, neither case has any bearing on whether the identification ***regulation*** is among the regulations for which a private right of action exists under the TCPA.

The distinction between the statutory and the regulatory identification requirements is crucial. In *McKenna v. Accurate Computer Services, Inc.,* 2002 TCPA Rep. 1135 (Colo. Dist. Feb. 24, 2002),[4] the court ruled that the plaintiff had stated a claim for violation of the regulation. He said:

> Although, no language in the regulation or TCPA itself denotes which TCPA regulations are specific to which subsection, ***there also is no language that excludes 47 C.F.R. § 68.318(d) from being a regulation under subsection § 227(b)***. For the purposes of this motion, the Court finds that violation of 47 C.F.R. § 68.318(d) provides an individual with a private right of action under § 227(b)(3)(A).

---

[4] The TCPA Reporter is an online topical reporter for cases under the TCPA. Access is free to judges and their law clerks at http://www.tcpalaw.com. The *McKenna* decision is attached as Exhibit A.

Slip op. at 5 n. 1 (emphasis added). *Accord, Schraut v. Rocky Mtn. Reclamation,* 2001 TCPA Rep. 1182 (Mo. Cir. Dec. 18, 2001);[5] *Sterling Realty Co. v. Klein,* 2005 TCPA Rep. 1353 (N.J. Super. Mar. 21, 2005).[6]

The FCC has made clear that the purpose of the identification requirements "is to ensure that consumers will have the information they need to identify the sender of an unsolicited facsimile message." Order on Further Reconsideration, 12 F.C.C. Rcd. 4609, 4610 ¶ 6 (FCC 97-117, April 10, 1997) (hereinafter 1997 Order). And the reason a consumer should be able to identify the sender is so that the consumer can participate in the enforcement scheme that Congress envisioned. As the Senate sponsor of the TCPA said, in a passage also quoted by Vision Lab in its brief: "Unless Congress makes it easier for consumers to obtain damages from those who violate this bill, these abuses will undoubtedly continue." 137 Cong. Rec. 30821 (102d Cong., 1st Sess., Nov. 7, 1991) (remarks of Sen. Hollings). Knowing who sent a fax is the *sine qua non* for suing him. Hence, the FCC may very well have concluded that the identification requirement it codified in 47 C.F.R. § 68.318(d)[(1)] was necessary **both** to fulfill the Congressional requirement that senders identify themselves [47 C.F.R. § 227(d)(1)(B)] **and** to implement the Congressional intent that consumers be able to find violators in order to sue them under § 227(b)(3).

The FCC also acknowledged the dual nature of the identification requirements in its 1995 order concerning its regulations under the TCPA. It said, "Pursuant **to the TCPA**, the Commission's rules require" identification. Memorandum and Order, 10 F.C.C. Rcd. 12391, 13401 ¶ 20 (FCC 95-310, Aug. 7, 1995) (emphasis added) (hereinafter 1995

---

[5] See Ex. B.
[6] See Ex. C.

Order). It wrote that "[m]anufacturers and users are subject to separate and independent requirements." *Id.* at 13402 ¶ 21. It even said that "[p]ersons sending telephone facsimile transmissions … ***are liable*** if [identifying] information is not included in a telephone message." *Id.* (emphasis added). And it cited ***both*** the statute and the regulation as authority for that statement. *Id.* n. 64. The FCC's juxtaposition, in several footnotes to its various rulings, of citations to both the statute and the regulation need not imply, as Vision Lab seems to suggest, that the FCC believes the two to be identical in scope. Rather, the circumstance that the FCC has cited both provisions might also indicate that the FCC believes them to be cumulative. If they are cumulative, there is no reason to limit enforcement of the regulation to the category of persons who can enforce the statute.

The FCC did ***not*** say in 1992 or 1995 that its regulations were pursuant to any particular subsection or paragraph of the TCPA. So limiting the authority for a regulation can lead to unnecessary and inappropriate limits on a regulation that would otherwise be entitled to full *Chevron* deference. "[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947). *See United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240, 245 (2d Cir. 1977) (court must look to subsection cited by agency and nowhere else). Nonetheless, "when agency rulemaking serves the purposes of the statute, courts should refuse to adopt a narrow construction of the enabling legislation which would undercut the agency's authority to promulgate such rules. . . . [Rather,] the court's role should be one of constructive cooperation with the agency in furtherance of the

public interest." *Nutritional Health Alliance v. FDA,* 318 F.3d 92, 98 (2d Cir. 2003) (quoting *Nova Scotia*).

In this case, the FCC's promulgation of a regulation requiring date, time, sender, and sending number identification serves the statutory purpose of helping consumers bring the senders of unsolicited facsimile advertisements to account for flouting the will of Congress that facsimile be used solely for consensual communication. The mere facts that Congress (a) forbade anyone to send a fax without providing certain identification [47 U.S.C. § 227(d)(1)(B)], and (b) directed the FCC to require fax machine manufacturers to provide a capability for transmitting that identification [47 U.S.C. § 227(d)(2)] does not afford a sufficient basis to infer that Congress foreclosed regulation "under" other subsections of the TCPA or under the TCPA as a whole that would facilitate identification of violators of the junk fax prohibition.

Vision Lab's reliance on *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 476 U.S. 837 (1984), is appropriate but misdirected. *Chevron* is authority that a court should normally defer to any reasonable interpretation of a law by the federal agency entrusted with the administration of that law. *Id.* at 844. *Chevron* most definitely applies to FCC interpretations of the Communications Act of 1934, of which the TCPA is a part. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 125 S. Ct. 2688, 2699 (2005). The measure of congressional intent is what Congress says in the statutes it enacts. Congress did not direct the FCC to require by regulation that fax senders obey the statutory directive to identify themselves; in fact, doing so would have been superfluous, since subsection 227(b)(1)(B) of the TCPA requires identification whether or not there is a regulation to the same effect. Absent, therefore, an unmistakable indication that the

FCC intended to deprive consumers of rights to enforce the fax identification requirements, this court should not second guess the facially broad sweep of the regulation.[7]

Finally, the Plaintiff emphasizes that seeking damages for lack of identification requirements is not merely "a futile attempt to inflate his damages." [Vision Lab Brief at 1]. The faxes at issue in this case can be traced to their source only with great difficulty and at great expense, by issuing multiple document subpoenas to telephone carriers and others, and by being prepared to enforce those subpoenas in the far-flung jurisdictions where the witnesses reside. The Plaintiff has obtained call detail records from his phone carrier that contain fictitious calling numbers and outdated carrier identification codes, suggesting that whoever actually sent the faxes has stolen the long distance service used to transmit them. ***The major cost of litigating this case is finding out who sent the faxes.*** And that cost flows directly and naturally from the failure of the senders to properly identify themselves. If any aspect of this case is more outrageous than the fact that the Plaintiff's peace and tranquility in his home has been invaded almost on a daily basis by people too cheap to pay for printing their own advertisements, this cowardly anonymity surely qualifies. And it cries out for an award of damages.

## II. THE PLAINTIFF HAS STATED A CLAIM FOR VIOLATION OF THE FAX BROADCASTER IDENTIFICATION REQUIREMENTS

The second sentence of the identification regulation quoted above, 47 C.F.R. § 68.318(d), also contains specific requirements for identification of a fax broadcaster who

---

[7] Vision Lab suggests that the "FCC is not empowered to create a private right of action that Congress never envisioned." Vision Lab Brief at 9. If that is what the FCC did by promulgating § 68.318(d) "under" the authority of the whole TCPA or "under" subsection (b) of the TCPA, this is not the correct forum to complain about it. *See* 47 U.S.C. § 402(a) (actions to enjoin, set aside, annul, or suspend FCC order must be brought under chapter 158 of title 28); 28 U.S.C. § 2342(a) (courts of appeals have exclusive jurisdiction over such actions).

has a "high degree of involvement" in sending the fax. Even if the court concludes that there is no private right of action for failure to transmit the date, time, sender name, and sending number information described in the first sentence of the regulation, the Plaintiff submits that he plainly has a right to seek damages for failure by a highly involved fax broadcaster to include the identification required by the second sentence. This conclusion flows inexorably from the history of that particular identification requirement.

In its initial round of rulemaking, the FCC took pains to except common carriers from the reach of the junk fax prohibition. *See* 1992 Order, 7 F.C.C.Rcd. at 8780 ¶ 54 (common carriers not liable for junk faxes in the absence of "a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions"). In 1995, the FCC issued this clarification: "We clarify that the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements, and that fax broadcasters are not liable for compliance with this rule." 1995 Order, 10 F.C.C.Rcd. at 12407 ¶ 35. It went on to state, however, "that facsimile broadcast services must ensure that their own identifying information appears on fax broadcasts." *Id.* at 12408. The FCC retreated from the 1995 position in 1997, when it found, in response to a petition by some telephone common carriers, that § 227(d)(1) "mandates that a facsimile include the identification of the business, other entity, or individual creating or originating a facsimile message and not the entity that transmits the message." 1997 Order, 12 F.C.C.Rcd. at 4611 ¶ 6.

There ensued a veritable flood of unwanted fax advertising, much of it originating from a single California company named fax.com. The FCC issued several citations to fax.com and other fax broadcasters during the period 2000 through 2002. *See generally*

http://www.fcc.gov/eb/tcd/ufax.html, which contains links to citations and other adjudicatory results relating to junk fax advertising since July of 1999. Finally, in the summer of 2002, the FCC issued a Notice of Apparent Liability against fax.com, in which it proposed to assess a fine exceeding $5 million. 17 F.C.C.Rcd. 15927 (FCC 02-226, Aug. 7, 2002). The FCC's enforcement effort was stymied for a time by a decision, subsequently reversed, of a district judge holding the TCPA's junk fax prohibition to violate the First Amendment. *See Missouri ex rel. Nixon v. American BlastFax,* 196 F.Supp.2d 920 (E.D. Mo. 2002), *rev'd,* 323 F.3d 649 (8th Cir. 2003), *cert. denied sub nom. Fax.com v. Missouri,* 540 U.S. 1104 (2004). With that obstacle out of the way, the FCC went on to formally assess the fine against fax.com. *See* 19 F.C.C.Rcd. 26 (DA 03-4119, Jan. 5, 2004).

The FCC embarked on another round of rulemaking in 2002 which culminated in, among other things, a set of regulations to implement a national do-not-call list. *See* Report and Order, 18 F.C.C.Rcd. 14014 (FCC 03-153, July 3, 2003) (hereinafter 2003 Order). The revised TCPA regulations included a new requirement for identification of any fax broadcaster having a "high degree of involvement" in facsimile messages. Several passages in the 2003 Order explain why the FCC felt a new regulation was required:

> Despite a general ban on faxing unsolicited advertisements, and aggressive enforcement by the Commission, faxed advertisements also have proliferated, as facsimile service providers (or "fax broadcasters") enable sellers to send advertisements to multiple destinations at relatively little cost. These unsolicited faxes impose costs on consumers, result in substantial inconvenience and disruption, and also may have serious implications for public safety.

*Id.* at 14022 ¶ 8. Additionally,

some consumers feel "besieged" by unsolicited faxes; others explain that advertisers continue to send faxes despite asking to be removed from senders' fax lists. Consumers emphasize that the burden of receiving unsolicited faxes is not just limited to the cost of paper and toner, but includes the time spent reading and disposing of faxes, the time the machine is printing an advertisement and is not operational for other purposes, and the intrusiveness of faxes transmitted at inconvenient times, including the middle of the night.

*Id.* at 14124 ¶ 186.

The FCC decided that "if a fax broadcaster is responsible for the content of the message or for determining the destination of the message (*i.e.,* supplying the list of facsimile numbers to which the faxes are sent), it should be identified on the facsimile, along with the entity whose products are advertised." *Id.* at 14133 ¶ 203. Tellingly, the FCC remarked that "[i]t has been the states' experience that fax broadcasters, who maintain their own databases and send others' advertisements to these fax numbers, frequently omit their identifying information as the sender *in order to avoid detection and enforcement action.*" *Id.* n. 745 (emphasis added).

Finally, and most importantly for this motion, the FCC concluded that the new identification requirement "will permit consumers to hold fax broadcasters accountable for fax advertisements when there is a high degree of involvement on the part of the fax broadcaster." *Id.* at 14134. In other words, the FCC anticipated that consumers like the present Plaintiff could recover damages when a highly involved fax broadcaster omitted to properly identify itself.

Accordingly, the requirement in 47 C.F.R. § 68.318(d)[(2)] that a fax broadcaster having a high degree of involvement in junk fax advertising must identify itself on every fax is among the regulations enforceable by a consumer under 47 U.S.C. § 227(b)(3).

III. THE PLAINTIFF HAS STATED A CLAIM FOR MULTIPLE DAMAGES FOR EACH FAX

The TCPA could not be more clear that ***each violation*** of the statute or a regulation thereunder is actionable and subjects the violator to statutory damages. *See* 47 U.S.C. § 227(b)(3)(B) ($500 damages for "each such violation"); *id.* § 227(c)(5) (up to $500 damages for "each such violation"). The Plaintiff has alleged facts that would support a finding that Vision Lab has committed as many as six violations of the laws and regulations under subsections (b) and (c) of § 227 for each fax that it sent. Those violations are: (1) having a high degree of involvement in sending the fax in the first place, (2) omitting the headers required by 47 C.F.R. § 68.318(d)[(1)], (3) omitting the fax broadcaster identification required by 47 C.F.R. § 68.318(d)[(2)], (4) falsifying or blocking caller identification, (5) placing a call to someone on the national do-not-call list, and (6) placing calls in the middle of the night. The TCPA permits the court to treble the statutory damages ***for each violation*** if it finds the violation to have been willful or knowing. The Plaintiff has also alleged facts that would support a finding that Vision Lab has committed as many as four violations of the MTSL for each fax: (1) making an unsolicited telephonic solicitation to someone on the do-not-call list, (2) making such a solicitation in the middle of the night, (3) making such a solicitation by facsimile, and (4) blocking caller id. Thus, the Plaintiff is asserting claims for as much as $9,000 in (trebled) statutory damages for each fax under the TCPA and FCC regulations, and as much as $20,000 in damages for each fax under the MTSL.

A court construing a criminal statute should normally presume that the legislature did not intend to pyramid penalties for a single act. *See Prince v. United States,* 352 U.S. 322, 327 (1957). The touchstone for analysis must always be legislative intent, however, for the legislature may "make each stick in a faggot a single criminal unit" if it wishes. *Bell*

*v. United States,* 349 U.S. 81, 83 (1955); *see Federal Aviation Admin. v. Landy,* 705 F.2d 624, 636 (2d Cir. 1983), *cert. denied,* 464 U.S. 895 (1983); *Tarrant v. Ponte,* 751 F.2d 459, 463 (1st Cir. 1985). One guiding principle has long been that, when each of two statutes requires proof of a fact that the other does not, a single act can lead to liability under both of them. *See Blockburger v. United States,* 284 U.S. 299, 304 (1932); *cf. Texas v. Cobb,* 532 U.S. 162, 173 (2001) (applying *Blockburger* rationale to right to counsel). *See also Morey v. Commonwealth,* 108 Mass. 433, 434 (1871); *Commonwealth v. Keohane,* 444 Mass. 563, 574 (2005).

The same principle should apply in civil cases, where mere dollars are at stake rather than personal liberty. The enumeration in the next preceding paragraph identifies the unique facts that the Plaintiff must prove to make out each of the six possible violations. Given the requisite proof, therefore, the Plaintiff is entitled to separate recoveries for each of the violations.

Permitting multiple recoveries makes perfect sense in the overall statutory and regulatory scheme. The purpose of the sender and broadcaster identification requirements is to make it possible for a consumer plaintiff to find his defendant. By flouting the requirements, the senders of the faxes at issue in this case have vastly increased the burden on the Plaintiff. They deserve to be separately punished for that. Mr. Sherman reasonably believed that putting his residential phone numbers on the do-not-call list would eliminate unwanted telemarketing calls, and he is entitled to recompense for someone's failure to scrub its number database against the do-not-call list. Calls to fax machines in the middle of the night ***wake people up!*** While Mr. Sherman has a fax machine connected to his phone, pity the consumer who inherits a number that was

previously used for a fax machine and that becomes the target of junk fax broadcasters—they must risk missing either sleep or emergency calls. There is therefore good reason to award damages separately for a middle-of-the-night call.

The case of *Worsham v. Nationwide Ins. Co.,* 772 A.2d 868 (Md. Ct. Spec. App. 2000), *cert. denied,* 778 A.2d 383 (Md. 2001), on which Vision Lab principally relies, was based on an incorrect view of why Congress created a private right of action. The opinion discusses the TCPA private right of action as if Congress ringed it about with restrictions in order to avoid overburdening the courts. *Id.* at 499-501. In a footnote, the court appears to complain that the TCPA "seems to have stimulated a cottage industry of 'business' consumer advocates who make money on the stray telephone call." *Id.* at 500 n.2.[8] Given the court's apparent hostility towards private lawsuits under the TCPA,[9] it is hardly surprising that the court stated, in dicta, that only one recovery could be had for a call, no matter how many violations it embodied. *Id.* n.5. If anything is plain from the legislative history, it is that Congress specifically wished to **encourage** citizen lawsuits, as part of a three-pronged plan to enlist the help of citizens, the FCC, and state attorneys general to enforce the TCPA. *See* 37 Cong. Rec. 30821 (102d Cong., 1st Sess., Nov. 7, 1991) (remarks of Sen. Hollings) (private right of action necessary to curb abuses).

---

[8] Mr. Sherman can hardly be accused of lurking, troll-like, under a bridge, waiting for the stray phone call to happen by. He offers to prove that, within a few months after he connected a fax machine to his phone line in early 2004, and without him publishing the number, he began receiving an ever-increasing number of junk ads. One or more scofflaws must have used the outlawed technique of "war dialing" to find his fax line and then sold his number to others. *Cf.* 47 C.F.R. § 64.1200(a)(7) (eff. Aug. 15, 2003) (outlawing war dialing).

[9] An additional measure of that particular court's disapproval of private suits under the TCPA can be taken by reviewing its conclusory—and decidedly contrarian—decision in *R.A. Ponte Architects v. Investors' Alert,* 815 A.2d 816 (Md. Ct. Spec. App. 2003), that Maryland's state courts lacked subject matter jurisdiction over TCPA junk fax claims. The highest court of Maryland corrected the error, bringing Maryland into line with all other states in permitting their courts to enforce this federal law. *See* 857 A.2d 1 (Md. 2004). *Cf. Testa v. Katt,* 330 U.S. 386, 394 (1947) (states cannot close doors to suits under federal statutes).

Given the Maryland intermediate appellate court's mistaken view of the utility of private actions under the TCPA, the *Worsham* opinion is not entitled to deference. Since each of the six possible violations of federal law requires proof of unique facts, and since each of the four possible violations of state law similarly requires proof of unique facts, the court should hold that each violation is separately actionable.

## IV. THE PLAINTIFF HAS STATED A CLAIM FOR RELIEF UNDER THE MASSACHUSETTS TELEMARKETING SOLICITATION LAW

In this section of this memorandum, the Plaintiff will address Vision Lab's argument in the alternative that the MTSL either does not reach fax advertising at all because of the "face to face" exemption or cannot reach interstate fax advertising because of preemption.

As a threshold matter, the Plaintiff notes that damages under the MTSL are ***in addition to*** damages under other laws. Mass. Gen. L. c. 159C, § 13; *Mulhern v. MacLeod,* 441 Mass. 754, 760 (2004). Consequently, and regardless of how the court rules on the questions of multiple damages explored in the preceding main section of this argument, the Plaintiff will be entitled to damages under both of the TCPA and the MTSL.

## A. THE FACE-TO-FACE MEETING EXEMPTION DOES NOT APPLY TO JUNK FAX ADVERTISING

The "face to face meeting" exception that appears in the definition of "unsolicited telephonic sales call" does not apply to fax advertising. As Vision Lab points out, it is never possible to complete a sale or obtain payment in a one-way transaction like a fax. Neither is completion or payment possible with a prerecorded advertisement. Hence, if the face-to-face exception were to apply to fax or prerecorded advertising, the exception

-18-

would swallow the rule and read the third and fourth clauses of § 3 of the MTSL out of the Act:

> A telephone solicitor shall not make or cause to be made an unsolicited telephonic sales call to a consumer: … (iii) in the form of electronically transmitted facsimiles; or (iv) by use of a recorded message device.

Mass. Gen. L. c. 159C, § 3.

A court should give effect to all the language in a statute. *See, e.g., Town Crier Inc. v. Chief of Police of Weston,* 361 Mass. 682, 687-688 (1972). The court should not construe a statute in a way that leads to an absurd result: "We will not adopt a literal construction of a statute if the consequences of such construction are absurd or unreasonable. We assume the Legislature intended to act reasonably. Rather, when a literal reading of a statute would be inconsistent with legislative intent, we look beyond the words of the statute." *Atty. General v. School Committee of Essex,* 387 Mass. 326, 336 (1982). The reading advocated by Vision Lab leads to the absurd conclusion that the legislature did not mean to prohibit fax or prerecorded advertising even though it plainly put language into the statute that would do so. Hence, the court should reject that reading.

In fact, the face-to-face exception is the result of a hasty drafting mistake. At the time the legislature enacted Chapter 159C, the FTC's Telemarketing Sales Rule (TSR) contained an exemption for "[t]elephone calls in which the sale of goods or services is not completed, and payment or authorization of payment is not required, until after a face-to-face sales presentation by the seller." 16 C.F.R. § 310.6(b)(3) (version in effect prior to October 1, 2003). This exemption applied, and still applies, only to the disclosure and other antifraud provisions of the TSR. The debate in the Massachusetts house occurred on July 23, 2002, and consisted in several brief announcements of the primary

purpose of the law—namely, the creation of a do-not-call registry that would dramatically reduce unwanted voice calls—and in the acceptance of several amendments. The face-to-face sales exemption was added by an amendment at that time with no discussion or explanation. *See* 2002 H.J. 2033-34 and the State House News Service for July 23, 2002. [Ex. D, E] There was no debate at all in the Senate. *See* 2002 S.J. 1871-72 (July 29, 2002). [Ex. F] When the FTC later amended the TSR to incorporate the national do-not-call registry, it explicitly excluded do-not-call violations from the scope of the face-to-face exemption. *See* 68 Fed. Reg. 4654-56 (Jan. 29, 2003) (explaining rationale for exclusion), *and see* 16 C.F.R. § 310.6(b)(3) (version effective October 1, 2003). It left the exemption in place, however, as to the anti-fraud provisions of the TSR.

Even if the face-to-face exemption applied to fax advertising in general, however, its application to this case should not be decided on a motion to dismiss. By its own terms, the exemption applies only when a sale is to be completed and payment required after a face-to-face presentation or meeting. The Plaintiff offers to prove that not one of the faxes at issue in this case proposes a face-to-face meeting, and that proof is within the permissible inferences from his allegation that the defendants have violated the MTSL. As noted earlier, the advertisers behind all of the faxes have taken nearly every imaginable step to cover their tracks. They want millions of fax recipients to buy their vacation packages, to buy a penny stock in which they have a position, to sign up for their bogus health cards, to believe that some mortgage broker really has a 1% loan available to everyone regardless of credit history, and so on. A face-to-face meeting prior to getting paid is the last thing they would wish for, since it would destroy the anonymity on which their schemes depend.

Since the face-to-face exemption leads to the absurd result that two of the four substantive prohibitions in the MTSL would be nullified, and since the application of the exemption turns on questions of fact, the Plaintiff's MTSL claims cannot be dismissed on this motion.

## B. THE MTSL VALIDLY PROHIBITS INTERSTATE JUNK FAX ADVERTISING DIRECTED TO MASSACHUSETTS RESIDENTS

The MTSL purports to regulate both intrastate and interstate telemarketing in a facially neutral way, as can be seen from the definitions of two phrases:

> 'Telephone solicitor' [means] an individual, association, corporation, partnership, limited partnership, limited liability company or other business entity, or a subsidiary or affiliate thereof, doing business in the commonwealth who makes or causes to be made a telephonic sales call.

> 'Doing business in the commonwealth' [means] conducting telephonic sales calls: (i) from a location in the commonwealth or (ii) from a location outside of the commonwealth to consumers in the commonwealth.

Mass. Gen. L. c. 159C, § 1. The Plaintiff is unaware of any Massachusetts state court decisions construing these definitions or bearing on the question whether the MTSL is subject to preemption.[10] Given the clarity of the definitions, however, this court should assume that a Massachusetts court would construe the MTSL as forbidding interstate junk faxes altogether, forbidding them outside the hours of 8:00 a.m. to 8:00 p.m., and forbidding them to persons who sign up for the Massachusetts do-not-call list. *See* Mass. Gen. L. c. 159C, § 3(i), (ii) & (iii) (prohibiting certain unsolicited telephonic sales calls) *Cf., e.g., Lorenc v. Be Free, Inc.,* 136 F. Supp. 2d 1, 4 (D. Mass. 2001).

---

[10] Preemption is one of the issues at stake in a motion to strike an affirmative exemption defense in the case of *Zizza v. International Data Collections, Inc.,* now pending in the Essex County Superior Court, Case No. 04-1924. The plaintiff in that case is represented by the same attorney who represents Mr. Sherman in this case. Argument on the motion to strike is scheduled for September 8, 2005. If the court reaches the substance of the preemption issue, its decision will likely overlap this court's consideration of the instant motion. The *Zizza* case involves a somewhat different issue, however, namely whether the MTSL validly prohibits an interstate marketing survey that is not a "telephone solicitation" under the TCPA.

It is true, as Vision Lab points out, that the Senate sponsors of the TCPA believed that states could not regulate interstate telemarketing. *See* 137 Cong. Rec. 30821 (102d Cong., 1st Sess., Nov. 7, 1991) (remarks of Sen. Hollings); S. Rep. 102-178 at 3 (1991). It is also true that the FCC has said that "any state regulation of interstate telemarketing calls that differs from our rules almost certainly would conflict with and frustrate the federal scheme and almost certainly would be preempted." 2003 Order, 18 F.C.C.Rcd. at 14064 ¶ 84. The sponsors' belief, since it turns out to have been unfounded, is beside the point. So too is the FCC's pronouncement if it *unreasonably* construes the TCPA's preemption section in light of constitutional restraints or congressional intent. *Cf. Chevron, supra.*

Here is what Congress actually had to say about preemption:

> nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, **or which prohibits** (A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements [or] (D) the making of telephone solicitations

47 U.S.C. § 227(e) (emphasis added).

The plain meaning of the preemption subsection is twofold. First, states may "impose[] more restrictive intrastate requirements or regulations on" certain activities. Second, states may prohibit those same activities. Congress thus gave the states plenary power to prohibit junk fax advertising and telephone solicitations without regard to state lines. Since Congress did not, in so many words, forbid states to prohibit interstate fax advertising, preemption must be found (if at all) by negative implication from what Congress actually said. And there is no basis for that implication.

### 1. CONGRESS HAS NOT IMPLICITLY PREEMPTED THE MTSL PROHIBITION ON JUNK FAX ADVERTISING OR MIDDLE-OF-NIGHT CALLS

Implicit preemption arises when compliance with both federal and state law is physically impossible, when state law frustrates Congressional purpose, or when Congress occupies an entire regulatory field. *See Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 98 (1992). None of these three circumstances is present in the case at bar.

Since both the TCPA and the MTSL forbid unsolicited facsimile advertising outright, there is plainly no physical impediment to obeying both laws. While the federal do-not-call law permits telephone solicitations until 9:00 p.m. and the Massachusetts cut-off is 8:00 p.m., a telephone solicitor can simply adapt its programming to avoid faxing into Massachusetts area codes between 8:00 and 9:00 p.m. and thereby comply with both laws. The time-of-day restrictions in the FCC's TCPA regulations and in the FTC's TSR certainly do not ***require*** telemarketers to place calls between the hours of 8:00 p.m. and 9:00 p.m.: they simply omit to forbid such calls. *Cf. Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 143 (1963) (compliance possible by leaving fruit on trees past earliest federally mandated picking date). The power of a computer program is surely capable of coping with differing time-of-day restrictions in different states, so that someone like Vision Lab would certainly be able to comply simultaneously with all state laws. *Cf. Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 529-530 (1959), where the Court struck down a state mud flap regulation that effectively required truckers to change flaps when they crossed the state line.

The avowed Congressional purpose in enacting the TCPA was to end what Senator Hollings, the bill's sponsor, called "telephone terrorism". 137 Cong. Rec. 30821 (102d Cong., 1st Sess., Nov. 7, 1991) (remarks of Sen. Hollings). Senator Hollings

characterized computerized telephone calls as "an enormous public nuisance" and as "the scourge of modern civilization." *Id.* Senator Inouye commented that "telemarketers must learn not to take advantage of their technology. They must learn to respect the privacy rights of consumers in their homes." *Id.* at 30824 (remarks of Sen. Inouye). The relevant Senate Report summarized the purposes of the bill in commensurate, albeit less colorful, terms:

> The purposes of the bill are to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile (tax) *[sic]* machines and automatic dialers.

S. Rep. No. 102-178, at 1 (1991). Far from frustrating the Congressional purpose, then, the MTSL actively furthers that purpose.

When Congress enacts a law that expressly preempts certain regulations, an inference arises that it did not intend to preempt other regulations. *See Freightliner Corp. v. Myrick,* 514 U.S. 280, 288 (1995). An intention to exclusively occupy an entire field may be inferred when "[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it [or when it touches] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947) (citations omitted). By leaving room for state regulation of certain kinds of telemarketing, Congress made clear that it was *not* precluding state laws on the same subject: it was encouraging them. *See also* 47 U.S.C. § 414 ("[n]othing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are

in addition to such remedies").[11] As noted by Justice Brennan, § 414 "plainly is inconsistent with congressional displacement of the state statute unless a finding of that meaning is unavoidable." *Head v. New Mexico Bd. of Examiners in Optometry,* 374 U.S. 424, 444 (1963) (Brennan, J., concurring).

Since compliance with both the TCPA and MTSL is physically possible, since the MTSL furthers the same policy goals as the TCPA, and since Congress has not wholly occupied the field of junk fax regulation, the MTSL has not implicitly been preempted.

   2. THE MTSL PROHIBITIONS ON JUNK FAX ADVERTISING AND MIDDLE-OF-
      NIGHT CALLS DO NOT OFFEND THE DORMANT COMMERCE CLAUSE

Not only does the Commerce Clause affirmatively grant Congress complete power over interstate commerce, but it "also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." *Healy v. The Beer Institute,* 491 U.S. 324, 326 n.1 (1989). Analysis under the "dormant" commerce clause begins with an examination of whether the state regulation at issue discriminates against out-of-state actors. *See, e.g., Oregon Waste Sys. v. Department of Envtl. Quality,* 511 U.S. 93, 99 (1994). The definitions quoted *supra* show that the MTSL applies equally to telephone solicitors located within and without the Commonwealth. "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970).

The MTSL operates to protect consumers' privacy in their homes and thus lies within the police power of the Commonwealth. *See, e.g., National Funeral Services, Inc. v.*

---

[11] The TCPA is part of the "chapter" to which § 414 refers.

*Rockefeller,* 870 F.2d 136, 146 (4th Cir. 1989), *cert. denied,* 493 U.S. 966 (1989). "Where the purpose of the statute is clearly within state police powers, and the effect is not to produce any economic discrimination, then the statute is only an indirect burden on interstate commerce, and only the most minimal sort of balancing, if any, is necessary." *National Kerosene Heater Assoc. v. Massachusetts,* 653 F. Supp. 1079, 1092 (D. Mass. 1987). *See also, e.g., Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.,* 519 U.S. 316, 325 (1997) ("historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress").

Accordingly, the dormant commerce clause does not prevent Massachusetts from legislating to prevent junk faxes or calls between 8:00 p.m. and 8:00 a.m.

### 3. CONGRESS DID NOT (BECAUSE IT CANNOT) PREEMPT THE MTSL PROHIBITION OF FAX CALLS TO SUBSCRIBERS ON THE MASSACHUSETTS DO-NOT-CALL LIST

Among the claims made by the Plaintiff in this case is that Vision Lab improperly transmitted advertisements to his residence after he registered his phone on the Massachusetts and national do-not-call lists. [Complaint ¶¶ 12, 16, 19] *See* Mass. Gen. L. c. 159C, § 3(i). The Plaintiff submits that Congress cannot (and the FCC *a fortiori* cannot) preempt a law like the MTSL that creates a right to opt out of a class of telemarketing calls and a scheme to enforce that right by court action. He relies in particular on the case of *Rowan v. United States Post Office,* 397 U.S. 728 (1970).

In *Rowan,* a group of mail-order businesses sued the Postal Service, seeking a declaration that 39 U.S.C. § 3008 (then codified as 39 U.S.C. § 4009) was unconstitutional. That statute permits any addressee to notify the Postal Service that he "in his sole discretion believes [a pandering advertisement] to be erotically arousing or

-26-

sexually provocative," whereupon the Postal Service must order the sender to refrain

from further mailings to that addressee. The Court first construed the statute to require

mailers to refrain from all future mailings to complaining addressees, regardless of

content. 397 U.S. at 735. So construed, the statute vested no discretion whatever in the

Postal Service, *id.,* and it left no doubt as to what actions a mailer must take after

receiving an order from the Postal Service, *id.* at 740. The Court then considered the

mailers' argument that the statute unconstitutionally interfered with their First

Amendment rights to communicate with addressees. "Nothing in the Constitution," the

Court said, "compels us to listen to or view any unwanted communication, whatever its

merit." *Id.* at 737. It went on to say

> We therefore categorically reject the argument that a vendor has a right under the
> Constitution or otherwise to send unwanted material into the home of another. If this
> prohibition operates to impede the flow of even valid ideas, the answer is that no one
> has a right to press even "good" ideas on an unwilling recipient. That we are often
> "captives" outside the sanctuary of the home and subject to objectionable speech and
> other sound does not mean we must be captives everywhere. … The asserted right of
> a mailer, we repeat, stops at the outer boundary of every person's domain.

*Id.* at 738 (citation omitted). *See also Frisby v. Schultz,* 487 U.S. 474, 485 (1988)

("individuals are not required to welcome unwanted speech into their own homes[, and]

the government may protect this freedom"). And compare *Mainstream Marketing

Services, Inc. v. FTC,* 358 F.3d 1228 (10th Cir. 2004), *cert. denied,* 125 S.Ct. 47 (2004),

where the Tenth Circuit Court of Appeals relied extensively on *Rowan* to reject a First

Amendment challenge to the FTC and FCC do-not-call rules.[12]

---

[12] The Plaintiff submits that do-not-call laws and rules do not involve the First Amendment rights of
solicitors in the first place, given an individual's untrammeled right to exclude unwanted speech from his
home. *Frisby,* cited in the text, upheld a city ordinance forbidding picketing in residential neighborhoods
based on the city's interest in protecting homeowners from unwanted speech—whether or not the
homeowners in question had requested a ban. Thus, while *Frisby* implicated such rights, neither *Rowan* nor
this aspect of the case does.

The do-not-call provisions of the MTSL are directly parallel to the federal statute at issue in *Rowan. See National Federation of the Blind v. FTC,* No. 04-1378, slip op. at 16 (4th Cir. Aug. 26, 2005) (parallels between *Rowan* and federal do-not-call law "are unmistakable"). The federal pandering statute permits a postal addressee to make a "do not mail" request to the Postal Service, 39 U.S.C. § 3008(b), while the MTSL permits a consumer to make an analogous "do not call" request to the Office of Consumer Affairs and Business Regulation, G.L. c. 159C, § 2. Within 30 days after a mailer receives notice that a particular addressee wishes not to receive any more mail, the mailer must purge its address lists and cease mailing, 39 U.S.C. § 3008(c); likewise, a telephone solicitor must refrain from calling numbers that are on the do-not-call list, G.L. c. 159C, § 3(i). The U.S. Attorney General may seek a compliance order against a mailer who violates a "do not mail" order, and violation of the compliance order may be punishable as contempt, 39 U.S.C. § 3008(3); the Massachusetts Attorney General may likewise seek injunctive relief and civil fines from MTSL violators, G.L. c. 159C, § 8(a), and private citizens may seek injunctive relief and money damages, *id.* § 8(b).

Both the postal pandering law and the do-not-call law thus empower private citizens to enlist government help in walling off their homes from unwanted communication. The Court's holding in *Rowan* implies that Congress *cannot* mandate that citizens be forced to accept unwanted fax advertisements. It follows that Congress **could not** have so completely and pervasively occupied the field of telemarketing regulation that there is no room for Massachusetts to restrict fax advertising at the behest of individual consumers. Rather than assume that Congress attempted an unconstitutional intrusion onto the privacy rights of the citizenry, this court should construe the TCPA preemption section in

such a way that no constitutional question arises. *See, e.g., Crowell v. Benson,* 285 U.S. 22, 62 (1932). That is, this court should conclude that Congress did not intend to preempt the MTSL section at issue in this case.

The Plaintiff would agree that national regulation of the technical aspects of telephony and of the rights and duties of telephone common carriers under their filed tariffs is essential. Consequently, courts should conclude that Congress has entirely occupied the field of interstate telephony *in those respects*. The case of *Bowman v. Chicago & N. Ry.,* 125 U.S. 465 (1888), illustrates the point. At issue in *Bowman* was an Iowa statute prohibiting rail carriers from delivering liquor to unlicensed sellers. While acknowledging the existence of state police power, the Court said that the state "cannot, without the consent of Congress, express or implied, regulate commerce between its people and those of the other States of the Union in order to effect its end, however desirable such a regulation might be." *Id.* at 493. *Bowman* concerned common carriers, however, and the Court determined that Congress had intended to wholly occupy the field of common carrier regulation. *See id.* at 485. *See also American Tel. & Tel. Co. v. Centraloffice Tel.,* 524 U.S. 214, 227 (1998) (unfiled contract terms of telephone carrier preempted by "filed rate" doctrine). No question arises in this case of the liability of the carriers over whose wires the Defendant's unwanted traffic was carried. *Cf. Sprint Corp. v. Evans,* 818 F. Supp. 1447 (M.D. Ala. 1993) (telephone carrier not liable for obscenity violations by its 800-number subscribers); *Louisiana Public Serv. Comm. v. FCC,* 476 U.S. 355, 379 (1986) (states free to prescribe depreciation method for intrastate rate setting because of specific Congressional permission). Neither did *Bowman* involve the

question, similar to the one presented here, whether a state might aid a homeowner in turning away unwanted liquor from his own door.

## V. IF HE PREVAILS ON HIS TCPA OR MTSL CLAIMS, THE PLAINTIFF WILL BE ENTITLED TO RECOVER THE REASONABLE FEES OF HIS ATTORNEY

If the Plaintiff prevails on his claims under the MTSL, he will plainly be entitled to have the losing defendant(s) pay the reasonable fees of his attorney. *See* Mass. Gen. L. c. 159C, § 3(c).[13] The Plaintiff also submits that the sending of junk fax advertisements violates the Massachusetts Consumer Protection Act, Mass. Gen. L. c. 93A, § 2, and that he will therefore be entitled to attorney's fees under § 9 of that Act.

Junk fax advertising is a *per se* violation of c. 93A, as demonstrated by the following line of reasoning. Section 2(c) permits the Massachusetts Attorney General to promulgate regulations further defining the acts and practices that are "unfair or deceptive" under the Act. Such regulations have the force of law. *See Purity Supreme, Inc. v. Attorney Gen.,* 380 Mass. 762, 775 (1980). One such regulation states that "an act or practice is a violation of M.G.L. c.93A, § 2 if … [i]t violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2." 940 C.M.R. § 3.16(4). The Telemarketing Sales Rule is manifestly a regulation under the FTC Act. *See* 15 U.S.C. § 6101(c). The TCPA and the FCC's rules thereunder have, as one of their main purposes, the protection of consumers and are thus "within the purview" of § 2. Hence, any of the federal law

---

[13] While the issue is not yet ripe, the Plaintiff notes that § 3(c) permits an award to the prevailing party "[i]n a civil proceeding resulting from a transaction involving a violation of this chapter …." If Vision Lab is correct that c. 159C does not apply to this case, either because it contains an exemption for all fax advertising or because federal law preempts it, this would not be "a civil proceeding resulting from a transaction involving a violation" of c. 159C. Consequently, Vision Lab would ***not*** be entitled to attorney's fees under § 3(c).

violations alleged in the complaint will, if proven, establish a 93A violation that will support an award of attorney's fees.

When a prospective 93A defendant has assets or a place of business in Massachusetts, a plaintiff must send a 30-day demand letter as a prerequisite to commencing suit. Mass. Gen. L. c. 93A, § 9(3). The Plaintiff is unaware that Vision Lab has assets or a place of business in the Commonwealth. Consequently, he need not have sent a pre-suit demand in order to claim under c. 93A. Specific allegations of willful or knowing actions are required to support multiple damages under § 9 when the defendant defaults. *See, e.g., Multi Technology, Inc. v. Mitchell Management Systems, Inc.,* 25 Mass. App. Ct. 333 (1988). A plaintiff need not, however, demonstrate a willful or knowing violation to recover his attorney's fees. *See* Mass. Gen. L. c. 93A, § 9(4); *Linthicum v. Archambault,* 379 Mass. 381, 388 (1979).

For these reasons, Vision Lab's motion to dismiss (or to strike) the Plaintiff's prospective and potential claim for attorney's fees should be denied.

WHEREFORE the Plaintiff respectfully requests that the court deny the subject motion in its entirety.

Dated:

MICHAEL SHERMAN, by his attorney,

/s/ Walter Oney
Walter Oney (BBO # 379795)
4 Longfellow Place
Boston, MA 02114
Tel: 617-227-5620
Fax: 617-227-5760

VERIFICATION

The undersigned certifies under the penalties of perjury that each of the exhibits annexed hereto are true and complete copies of what they purport to be and that each fact stated in this motion is true, except that, as to facts stated on information or belief, he believes them to be true.

Dated:

/s/ Walter Oney _____

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the following parties by the method indicated:

**By automatic electronic notice:**

Richard M. Zielinski, Esq., Attorney for Vision Lab Telecommunications, Inc.

**By first-class mail, postage prepaid:**

(None)


Dated:

/s/ Walter Oney

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL SHERMAN,                )            Civil No. 05-11545-NG
          Plaintiff            )
     v.                        )
VISION LAB TELECOMMUNICATIONS, )
     INC., et al.,             )
          Defendants           )

INDEX OF EXHIBITS TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

A. Opinion in *McKenna v. Accurate Computer Systems,* 2002 TCPA Rep. 1135 (Colo. Dist. Feb. 24, 2002).
B. Opinion in *Schraut v. Rocky Mtn. Reclamation,* 2001 TCPA Rep. 1182 (Mo. Cir. Dec. 18, 2001).
C. Opinion in *Sterling Realty Co. v. Klein,* 2005 TCPA Rep. 1353 (N.J. Super. Mar. 21, 2005).
D. Selected pages from 2002 Massachusetts House Journal.
E. Selected pages from 2002 Massachusetts State House News.
F. Selected pages from 2002 Massachusetts Senate Journal.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHAEL SHERMAN, | ) | Civil No. 05-11545-NG |
|     Plaintiff | ) | |
|     v. | ) | |
| VISION LAB TELECOMMUNICATIONS, | ) | |
|     INC., et al., | ) | |
|     Defendants | ) | |

INDEX OF EXHIBITS TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

A.  Opinion in *McKenna v. Accurate Computer Systems,* 2002 TCPA Rep. 1135 (Colo. Dist. Feb. 24, 2002).

B.  Opinion in *Schraut v. Rocky Mtn. Reclamation,* 2001 TCPA Rep. 1182 (Mo. Cir. Dec. 18, 2001).

C.  Opinion in *Sterling Realty Co. v. Klein,* 2005 TCPA Rep. 1353 (N.J. Super. Mar. 21, 2005).

D.  Selected pages from 2002 Massachusetts House Journal.

E.  Selected pages from 2002 Massachusetts State House News.

F.  Selected pages from 2002 Massachusetts Senate Journal.

# EXHIBIT A

DISTRICT COURT, COUNTY OF BOULDER, STATE OF COLORADO

Case No. 02 CV 1329, Division 2

**RULING AND ORDER**

DOUGLAS M. MCKENNA, individually, and as President of Mathemaesthetics, Inc., a Colorado corporation, as their interests may appear,

     Plaintiff,

v.

ACCURATE COMPUTER SERVICE, INC.;
ALLIANCE TICKETS, INC.;
ARANDA GROUP ENTERPRISES, LLC;
CRYSTAL ROSE MANAGEMENT CO., INC.;
DENVER CENTER FOR THE PERFORMING ARTS;
GERRITY AGENCY, INC.;
RAINTREE MORTGAGE SERVICES, INC.;
RELATRIX CORPORATION;
LEISURE INDUSTRIES CORPORATION;
RESORT MANAGEMENT GROUP, L.L.C.;
TRANDALL SPORTS, INC.;
TRAVEL NOW, INC.; and
JOHN DOES #1-100,



     Defendants.

     On **February** , 2003, the Court took the following actions on the above-captioned case. The Clerk is directed to enter these proceedings into the register of action.

     This matter comes before the Court on Defendants Trandall Sports, Inc.'s motion under C.R.C.P. 12(b)(5) for failure to state a claim upon which relief can be granted. Plaintiffs, Douglas M. McKenna and Mathemaesthetics, Inc. have filed a Combined Response to which Defendant Trandall Sports, Inc. has filed a Reply. Having considered the parties' briefs and applicable law, the Court enters the following Order.

## I.    STANDARD OF REVIEW

     When reviewing a motion to dismiss, the Court must accept the material allegations of the complaint as true and may not dismiss a claim unless the non-moving party is not entitled to relief under any statement of facts. *Douglas County Nat'l Bank v. Pfeiff*, 809 P.2d 1100 (Colo.

1

App. 1991). If relief could be granted on the basis of the facts stated in the complaint, then the complaint is sufficient. *Schlitters v. State of Colorado*, 787 P.2d 656, 658 (Colo. App. 1990). The allegations contained in the complaint must be viewed in the light most favorable to the plaintiff. *Fogg v. Macaluso*, 892 P.2d 271, 273 (Colo. 1995). A Court may not consider matters outside the allegations in the complaint when ruling on a motion to dismiss. *Dunlap v. Colorado Springs Cablevision*, 829 P.2d 1286, 1290 (Colo. 1992). "Rule 12(b)(5) motions are viewed with disfavor, and should not be granted unless it appears beyond doubt that the plaintiff cannot prove facts in support of the claim that would entitle the plaintiff to relief." *Schoen v. Morris*, 15 P.3d 1094,1096 (Colo. 2000); *Dunlap v. Colo. Springs Cablevision*, 829 P.2d 1286, (Colo. 1992).

## II.    FACTS

In considering this Rule 12 Motion to Dismiss, the Court must take the allegations of Plaintiffs' Complaint as true. Therefore, the pertinent facts as found in Plaintiffs Douglas M. McKenna ("McKenna") and Mathemaesthetics, Inc.'s, ("Math, Inc."), [hereinafter collectively referred to as "Plaintiffs"] Complaint are as follows:

McKenna is an individual who resides in the City and County of Boulder, State of Colorado. He maintains a principal residence at 1140 Linden Avenue, Boulder and a telephone line with a telephone facsimile ("fax") machine at a home at 47517 Highway 72 in Ward, CO. Plaintiff Math, Inc. is a Colorado corporation whose principal offices are at a home at 47517 Highway 72 in Ward, CO.

Defendant Trandall Sports, Inc. ("Trandall") is a Colorado corporation whose principal offices are located in the State of Colorado.

The Complaint outlines Plaintiffs' factual allegations as to Defendant Trandall. The relevant section reads as follows:

### XIII. FACTUAL ALLEGATIONS AND CLAIMS FOR RELIEF
### AS TO DEFENDANT TRANDALL SPORTS, INC.

13.1  On or about March 22, 2001, and again on or about April 11, 2001, and again on or about May 2, 2000, and again on June 11, 2001, Plaintiff Math[, Inc.] received unsolicited fax advertisements sent on behalf of the Defendant Trandall. Copies of these faxes are attached hereto and incorporated herein by reference as Exhibits #19, #20, #21 and #22 respectively. The faxes referred to herein were sent without the Plaintiff's prior express permission or invitation, and therefore, constitute separate and distinct violations of 47 USC Section 227(b)(1)(C) with respect to each fax sent.

13.2  The faxes referred to herein were sent without having clearly marked in a margin at the top or bottom or each transmitted page of the message or on the first page of each transmission, the date and time each was sent and an identification of the business, other entity or individual sending the message and the telephone number of the sending machine or of such business, other entity or individual. This constitutes an additional violation of the statutory prohibitions of 47 USC Section 227 with respect to each fax sent.

2

13.3 The fax attached hereto as Exhibit #20 failed to include therein, a toll-free telephone number as required under C.R.S. Section 6-1-702(1)(b)(I) of the Colorado Consumer Protection Act ("CCPA"). This constitutes an additional violation of the statutory prohibitions of the CCPA with respect to that specific transmission.

13.4 The faxes referred to herein contain a total of nine (9) separate and distinct violations of 47 USC Section 227 and the CCPA.

*See Complaint* at 14-15.

This matter comes before the Court on Defendant Trandall's Motion to Dismiss of September 20, 2002, to which Plaintiffs filed a Response on October 18, 2002. Trandall filed a Reply on November 11, 2002.

Plaintiffs' complaint asserts the following claims for relief as to all Defendants: (1) Negligence per se and negligence for violating the TCPA; (2) Knowing and willful violations of the TCPA (2); violation of the Colorado Consumer Protection Act § 6-1-105 *et seq.* C.R.S., (2001) ("CCPA"); injunctive relief pursuant to both the TCPA and the CCPA. Plaintiffs seek injunctive relief, damages, and attorney fees and costs against defendants.

The Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227(b)(3), provides that state courts have exclusive subject matter jurisdiction over private actions brought under it.

### III.    MERITS

*Failure to State a Claim*

#### 1. Alleged CCPA Violation

Defendant Trandall first argues that dismissal is proper because its facsimile transmissions do not violate the CCPA. Specifically, Trandall disputes Plaintiff Math Inc.'s allegation that Trandall's failure to provide a toll-free number, rather than just a local number, caused damage to Math Inc.

The CCPA states:

> A person engages in a deceptive trade practice when, in the course of such person's business, vocation or occupation, such person:

> \*          \*          \*

> (b)(I) Solicits a consumer residing in Colorado by a facsimile transmission without including in the facsimile message a *toll-free number* that a recipient of the unsolicited transmission may use to notify the sender not to transmit to the recipient any further unsolicited transmissions.

3

C.R.S. § 6-1-702(1)(b)(I) (emphasis added).

The Complaint alleges that on or about April 11, 2001, Defendant Trandall had a fax sent on its behalf to Plaintiff Math, Inc. *See Complaint* at 13.1. This fax, attached to the Complaint as Exhibit 20 did not have a toll free number printed on it, as required by CCPA C.R.S. § 6-1-702(1)(b)(I). *See Complaint* at 13.3.

Although the CCPA and other Colorado statutes that use the term "toll-free telephone number" do not define it, the Federal Communications Commission ("FCC") does. "Calls using either 866, 877, 888, or 800 numbers are all toll-free calls." FCC, TOLL FREE FAQ, found at http://www.fcc.gov/wcb/tapd/toll_free/888faq.html (last visited Feb. 18, 2003).

Also, in looking at links on the Federal Citizen Information Center's web site, the Court finds that "Fed. Phone #s" link takes the user to a list of federal agency phone numbers, many of which begin with area codes such as 202 (denoting a District of Columbia phone number) and 703 (denoting a Northern Virginia phone number). Other numbers begin with one of then previously mentioned toll-free prefixes (e.g. 800, 888, etc.). *See* http://www.pueblo.gsa.gov/call/phone.htm (last visited Feb. 18, 2003). However when a user selects a link entitled "Fed. Toll-free #s, a page listing *only* agencies and entities and their respective toll-free numbers beginning with 800, 888, 877. and 866 appear. *See* http://www.pueblo.gsa.gov/call/toll-free.htm (last visited Feb. 18, 2003).

Finally, for purposes of its analysis of whether a toll free number and a local number are one in the same, the Court is persuaded by the plain language of the CCPA which requires the presence of a "toll-free number" - not a local number - on unsolicited fax transmissions. For purposes of this motion only, the Court finds that a number beginning with a "303" area code is not a toll-free number as required on unsolicited faxes by the CCPA.

Next, Trandall argues that because Math Inc. does not allege the required injury, dismissal is therefore proper for failure to state a claim for relief under the CCPA. Defendant Trandall's argument fails under the Damages provision of the CCPA, codified at C.R.S. § 6-1-113(2), which states:

> Except in a class action or a case brought for a violation of section 6-1-709, any person who, in a private civil action is found to have engaged in or caused another to engage in any deceptive trade practice listed in this article shall be liable in an amount equal to the sum of:
>     (a)  The greater of:
>         (I)  The amount of actual damages sustained; or
>         (II) *Five hundred dollars*; or
>         (III) Three times the amount of actual damages sustained . . . .

C.R.S. . § 6-1-113(2) (emphasis added).

The Court finds § 6-1-113(2)(a)(II) applicable to the instant case. In this subparagraph the Colorado General Assembly has provided a liquidated damages provision in the statute, so as

to give a private right of action to any individual who has found him or herself on the receiving end of a deceptive trade practice. *See generally Hall v. Walter*, 969 P.2d 224 (Colo. 1998).

The Court finds that Plaintiffs have stated a claim for relief under the CCPA, and thus, Defendant Trandall's Motion to Dismiss the CCPA claim is DENIED.

### 2. Alleged TCPA Violation

Defendant Trandall's Motion to Dismiss addresses Plaintiffs' allegations that Trandall's actions, or actions performed on its behalf, violated the TCPA. *See Complaint* at ¶ 13.2; *see also* Exhibits 19-22. Under the TCPA, it is unlawful for any person "to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C). The TCPA defines the term "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4).

There exist two subsections under TCPA, 47 U.S.C. § 227:  § 227(b) entitled "Restrictions on the Use of Automated Telephone Equipment and § 227(d), entitled "Technical and Procedural Standards."  § 227(b) places prohibitions on the sending of unsolicited fax advertisements, while a paragraph under § 227(d) prohibits any person within the United States from using:

> a computer or other electronic device to send any message via telephone facsimile machine unless such person *clearly marks, in a margin* at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual.

47 U.S.C. § 227(d)(1)(B) (emphasis added).

Although no provision for a private right of action exists under § 227(d), one does exist under § 227(b), "based on a violation of this subsection *or the regulations prescribed under this subsection*." 47 U.S.C. § 227(b)(3)(A) (emphasis added).  Among the regulations promulgated under the TCPA is 47 C.F.R. § 68.318(d).[1]

> *Telephone facsimile machines; Identification of the sender of the message.* It shall be unlawful for any person within the United States to use a computer or other electronic device to send any message via a telephone facsimile machine unless such message clearly contains, in a margin at the top or bottom of each transmitted page or on the first page of the transmission, the date and time it is sent and an identification of the business,

---

[1] Although, no language in the regulation or TCPA itself that denotes which TCPA regulations are specific to which subsection, there also is no language that excludes 47 C.F.R. § 68.318(d) from being a regulation under subsection § 227(b).  For the purposes of this motion, the Court finds that violation of 47 C.F.R. § 68.318(d) provides an individual with a private right of action under § 227(b)(3)(A).

> other entity, or individual sending the message and the telephone number of
> the sending machine or of such business, other entity, or individual.
> Telephone facsimile machines manufactured on and after December 20,
> 1992, must clearly mark such identifying information on each transmitted
> page.

47 C.F.R. § 68.318(d).

In reviewing the Complaint and accompanying exhibits #19-22, the Court finds that
Plaintiffs have stated a claim against Defendant Trandall under the TCPA and its regulations and
upon which relief can be granted. The Court now turns to Trandall's argument regarding the
unconstitutionality of the TCPA.

Trandall argues that Plaintiffs' TCPA claim should be dismissed, because the statute is
unconstitutional. Trandall relies on the recent case, *Missouri ex rel. Nixon v. American Blast
Fax and Fax.com, Inc.*, 196 F.Supp.2d 920 (E.D. Mo. 2002) (appeal pending) [hereinafter
"*ABF*"]. In *ABF* a Missouri federal district court granted summary judgment on defendants'
motion to dismiss the Missouri Attorney General's TCPA claim for sending unsolicited fax
advertisements, holding that TCPA provision that prohibits unsolicited fax advertisements is
inconsistent with First Amendment free speech protections.

In applying "intermediate" level scrutiny for regulation of commercial speech, as set out
in *Central Hudson*, the district court found that the Plaintiff had failed to meet its burden of
proof. *See* 196 F.Supp.2d 920; *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Util. Comm'n
of N.Y.*, 447 U.S. 557 (1980).

> At the outset, we must determine whether the expression is protected by the
> First Amendment. For commercial speech to come within that provision, it at
> least must concern lawful activity and not be misleading. Next, we ask
> whether the asserted governmental interest is substantial. If both inquiries
> yield positive answers, we must determine whether the regulation directly
> advances the governmental interest asserted, and whether it is not more
> extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566.

The *ABF* court found that expression at issue in this cause of action is afforded a level of
protection under the First Amendment and that the defendants' fax advertisements concerned
lawful activity and were not misleading. *ABF*, 196 F.Supp.2d at 928. *ABF* court then found that
the "government fail[ed] to meet its burden in demonstrating that the harms it recit[ed were] real
and that its restrictions [would] in fact alleviate them to a material degree." *Id.* at 934. A New
York state trial court recently accepted the teachings of *ABF*, declaring that TCPA provisions
violate the U.S. and New York Constitutions. *Rudgayzer &Gratt v. Enine, Inc.*, 749 N.Y.S.2d
855 (Civ.Ct. 2002)

Other jurisdictions - both federal and state - that have examined the TCPA's
constitutionality have upheld the statute. For example, a federal district court upheld the
constitutionality of the TCPA fax blasting restrictions and enjoined the defendant's fax blasting

practices *State ex rel. Hatch v. Sunbelt Communications and Marketing, LLC*, 2002 WL 31017503 (D.Minn.). Applying *Central Hudson* and beginning its analysis with the TCPA's legislative history, the court stated, "[t]he TCPA was enacted to protect the privacy interests of residential telephone subscribers by restricting certain uses of fax machines." 2002 WL 31017503 at 3 (citing *Int'l Sci. & Tech. Inst., Inc. v. Inacom Communications, Inc.*, 106 F.3d 1146, 1150 (4th Cir.1997) (*citing* S.Rep. No. 102-178, at 1 (1991), *reprinted in* 1991 U.S.C.C.A.N.1968)). *See also, Zeid v. The Reding Law Firm, P.C.*, No. 01AC-013005 (Div. 39, Cir. Ct. Mo., March 19, 2002).

This fact in addition to the claimed interest in avoided shifting the cost of fax advertising to consumers (i.e., cost of time, toner and paper) led the *Sunbelt* court to find that the "substantial government interest" prong of the *Central Hudson* test was satisfied. *See* 2002 WL 31017503, *5. Additionally the court in *Destination Ventures, Ltd. v. F.C.C.*, 844 F.Supp. 632 (D.Or.1994), found that Congress' interest in preventing cost shifting "from the advertiser to the unwitting customer" and in avoiding the tying up of fax machines by unwanted faxes "is a substantial interest which is identified in the TCPA's legislative history. *See id.* at 637 (quoting TCPA House Report). The *Destination Ventures* opinion stated, "there were repeated, uncontradicted references made before Congress describing how facsimile advertising shifts economic burdens from the advertiser to the consumer....Congress legitimately relied upon the testimony from authorities, as well as the contemporaneous state laws and media reports." *Texas v. American Blastfax, Inc.*, 121 F.Supp.2d 1085, 1091-92 (W.D.Tex.,2000) (citing *Destination Ventures*, 844 F.Supp. at 637). The Court is persuaded by these findings.

Moreover, the Court agrees that the TCPA advances the government interests stated above. It takes no great stretch of the imagination to see how prohibiting unwanted faxes would prevent tying up fax machines or requiring a consumer to pay for toner and paper to accommodate unsolicited and unwanted faxes. It is true that such costs may negligible to some consumers, but in the aggregate, or to a consumer with less means, these costs may be imposing. "The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another person's home or office." *Dietman v. Time, Inc.* 449 F.2d 245, 249 (9th Cir. 1971). The TCPA clearly serves the salutary purpose of preserving the privacy interests of residential telephone subscribers.

In the present case, the Defendant Trandall is also alleged to have violated a provision that requires the sender of the fax to clearly identify him or herself and to give a telephone number of the sending machine. The Court finds that such a small identification would serve to protect residential telephone subscribers' privacy interests, as fax contact is less invasive when the initiator has properly identified him or herself.

Finally, in turning to the last *Central Hudson* prong, the Court finds that self-identification on a fax is a relatively small imposition, and it is not more extensive than necessary to fulfil Congress' objectives. The Court is not persuaded by Defendant Trandall's argument that the TCPA's restrictions "chill" its "right and freedom to exercise its commercial speech by proposing commercial transactions, in this case entertainment, to plaintiff and all recipients on its list." *Trandall's Motion to Dismiss* at 8. With regards to the TCPA § 227(b)(1)(C) prohibition on sending unsolicited facsimile advertisements, this Court adopts the

views of courts that have all rejected arguments that a better and more narrowly tailored option exists in requiring a consumer to "opt in" do-not-fax list. *See Texas v. Am. Blastfax, Inc.,* 121 F.Supp.2d 1085, 1092; *Kenro, Inc., v. Fax Daily, Inc.,* 962 F.Supp. 1162, 1172 (S.D.Ind.1997); *Destination Ventures,* 844 F.Supp. at 640.

The Court finds that Plaintiffs have stated a claim for relief under the TCPA, and thus, Defendant Trandall's motion to dismiss the TCPA claim is DENIED.

## IV.    CONCLUSION

For the aforementioned reasons, Defendant Trandall's Motion to Dismiss is **DENIED** as to both the CCPA and the TCPA claims.

Done this 24 day of February, 2003.

BY THE COURT

Daniel C. Hale
District Court Judge

FEB 2 5 2003

8

# EXHIBIT B

Case 1:05-cv-11545-NG    Document 23-2    Filed 09/06/2005    Page 12 of 32

## IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS

## STATE OF MISSOURI

### LOIS SCHRAUT, Plaintiff,

### v.

### ROCKY MOUNTAIN RECLAMATION, Defendant.

### Cause No. 01AC-002848 O CV

### Division 39

### Decided December 18, 2001

NOTICE: The rules of some jurisdictions may impose limitations on the use of materials not designated for publication in certain officially sanctioned reporters. Consult the rules of the applicable jurisdiction regarding use and citation of this opinion.

**DISPOSITION:**

Defendant's motion to dismiss granted in part and denied in part.

**SYNOPSIS:**

Defendant sought to dismiss plaintiff's claims for unsolicited faxes arguing that 1) the faxes were not an "advertisement" under the TCPA; 2) that there is no cause of action for the technical violations of the statute requiring date and time be denoted on all faxes; and 3) injunctive relief is inappropriate. The court held that violations of the header identification requirements in the statute were not actionable, but violations of similar requirements in the regulations were actionable under 47 U.S.C. § 227(B)(3). The court also rejected defendant's argument that goods or services must be offered "for sale" in order to be covered by the statute, and held that injunctive relief was statutory and available upon a violation of the statute.

**SUBSEQUENT HISTORY:**

**PRIOR HISTORY:**

**CITED BY:**

**APPEARANCES:**

Max Margulis, Margulis Law Group, Chesterfield Missouri for Plaintiff.

John E. Toma, Jr., St. Louis, Missouri for defendant.

**JUDGES:**

Patrick J. Clifford

**HOLDINGS:**

### [☞1] Unsolicited Advertisement

The TCPA only requires that the faxes "advertise the commercial availability or quality of any property, goods or services." It does not require that such property, goods, or services be "for sale."

### [☞2] Header violations (fax)

There is no private right of action for violations of the statute's proscriptions at 47 U.S.C. § 227(d).

**[☞3] Header violations (fax)**

Violations of the FCC's regulations at 47 C.F.R. 68.318 mandating identification in the fax header are actionable under 47 U.S.C. § 227(b)(3).

**[☞4] Header violations (fax)**

It seems abundantly clear that a fax that violates both the statute and the identification requirements of the regulations is "worse" than a fax that only violates only a single proscription.

**[☞5] Multiple violations (per fax)**

Consumers have a right to be free from unsolicited advertising faxes ,and they also have a right to receive proper identification on all faxes. A consumer who receives a call or fax violating multiple rights provided under the TCPA should recover for each right violated.

**[☞6] Remedial/Penal nature**

The TCPA is a remedial consumer protection statute.

**[☞7] Injunction - statutory**

If Plaintiff proves a violation of the statute, he will be entitled to an injunction.

**OPINION:**

### ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO DISMISS

[*1] This matter came before the Court on November 6, 2001 on Defendant's motion to dismiss Plaintiff's Second Amended Petition. This is an action originally brought by Plaintiff against Defendant alleging three unsolicited facsimile advertisements were sent to Plaintiff in violation of the Telephone Consumer Protection Act ("TCPA") 47 U.S.C. § 227. Defendant seeks to dismiss the Petition arguing that 1) Defendant did not send an "advertisement" to Plaintiff; 2) that there is no cause of action for the technical violations of the statute requiring date and time be denoted on all faxes; and 3) injunctive relief is "unprecedented." The parties have filed memoranda of law and the Court has heard the arguments of both parties.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### I.    Standard of Review

On a motion to dismiss, "we accept as true the facts properly pleaded, giving the averments a liberal construction, and making those reasonable inferences fairly deducible from the facts stated." *Concerned Parents v. Caruthersville School Dist.18*, 548 S.W.2d 554, 558 (Mo. 1977). This facts pleaded claim that Defendant sent the faxes in question to Plaintiff on August 2, 2000, January 10, 2001, and on or about June 1, 2001, and that the fax sent on or about June 1, 2001 "did not include the date and time in the header and therefore constituted a violation of 47 U.S.C. § 227(d)(1) and 47 C.F.R. 68.318(c) (3)." Second Am. Pet. at ¶ 8. These facts are assumed true for the purposes of this motion.

#### II.    Elements of the Telephone Consumer Protection Act.

The elements of a junk fax claim under the TCPA are that a person 1) uses a telephone facsimile machine, computer, or other device 2) to send an unsolicited advertisement. Plaintiff has properly alleged that Defendant sent the faxes at issue, and copies of the faxes are attached to the Petition, and Defendant's motion. The first question is whether or not the facsimile contains an "unsolicited advertisement." This issue most ordinarily be resolved in favor of Plaintiff in a motion to dismiss, since he has sufficiently plead that the faxes are "unsolicited advertisements" as defined by the statute. However, since the faxes at issue are already before the Court, and in that the statute contains an ample definition of "unsolicited advertisement," it is a straightforward application of the law to the facts that would normally need to be tested in a motion for summary judgment. The Court will thus reach this question in the interest of judicial economy.

#### A.    Definition of "unsolicited advertisement"

The statute defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services." The faxes at issue certainly fit this definition. Defendant is engaged in a commercial enterprise. On their face, the faxes are for the purpose of furthering that commercial enterprise, and do so by announcing that Defendant is offering to buy and sell used refrigerant. Used refrigerant clearly is within the meaning of "property, goods, or services."

So is this material "advertising?" Webster's dictionary defines "advertise" as "to make something known to : notify." Defendant's brief argues that the property, goods or services must be offered "for sale." Def. Memo at 2. That overly-restrictive definition is not part of the statute.

[☞ 1] The TCPA only requires that the faxes "advertise the commercial availability or quality of *any* property, goods or services." It does not require that such property, goods, or services be "for sale." Even a cursory glance at the faxes at issue shows that Defendant's service of buying, selling, processing, and banking used refrigerant. But even by Defendant's altered, restrictive definition, these faxes clearly advertise that defendant's goods (used refrigerant) is available for sale. This is a pristine example of where the application of the time honored "duck test" is appropriate - "If it walks like a duck, quacks like a duck, and looks like a duck, then it's a duck." *BMC Industries, Inc. v. Barth Industries, Inc.*, 160 F.3d 1322, 1337 (11th Cir., 1998). Taken as a whole, these faxes clearly are "unsolicited advertisements" under the TCPA.

**B.    Consideration of *Lutz Appellate Svcs. v. Curry***

Defendant's reliance on *Lutz Appellate Svcs. v. Curry*, 859 F. Supp. 180 (E.D. Pa. 1994) is wholly distinguish-able. *Lutz* was an unappealed, early trial court decision, decided on the narrow issue that the short 4 line fax, sent from a man who opened his own business sent to his former co-workers at his former place of business, was "not the advertisement of the commercial availability of property." *Id.* at 181. The court likened the fax to a "help wanted" sign. *Id.* The fax in this case is not a "help wanted" sign, it is a multi-paragraph exaltation of Defendant's company, and advertisement of its services, and goods it deals in. *Lutz* is simply not on point. This Court similarly distinguished *Lutz* while addressing a nearly identical situation in *Davis, Keller, Wiggins, LLC. v. JTH Tax, Inc.*, No. 00AC-023289 (Div. 39, Mo. Cir. Ct. Aug. 28, 2001).

**II.    Are violation of the FCC's regulations requiring time and date be included on each facsimile transmission actionable?**

Plaintiff alleges that the date and time were not provided in the fax he received on June 1, 2001. Defendant argues that even if true, there is no private right of action for that particular omission. So taking as true Plaintiff's allegation that the date and time were omitted, the question is raised as to whether or not such an omission is actionable under the TCPA.

[☞ 2] Defendant argues that there is no private right of action for violations of the statute's proscriptions at 47 U.S.C. § 227(d). This is correct. Plaintiff's cause of action for a violation of 47 U.S.C. § 227(d) is dismissed, as there is no private right of action for violating section (d) of the statute. But Plaintiff has alleged not only a violation of 47 U.S.C. § 227(d), but *also* 47 C.F.R. 68.318(d) [FN1] (Second. Am. Pet. at ¶ 8). Those regulations state in pertinent part state:

> Telephone facsimile machines; Identification of the sender of the message. *It shall be unlawful for any person within the United States to use a computer or other electronic device to send any message via a telephone facsimile machine unless such message clearly contains, in a margin at the top or bottom of each transmitted page or on the first page of the transmission, the date and time it is sent* and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual. Telephone facsimile machines manufactured on and after December 20, 1992, must clearly mark such identifying information on each transmitted message.

(emphasis added). Plaintiff's Petition alleges facts that constitute a violation of this regulation. The question that is presented, is can Plaintiff sue for a violation of the regulations? This Court holds that he can. [☞ 3] Violations of the FCC's regulations are actionable under 47 U.S.C. § 227(b)(3):

> A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State–
>
> (A) an action based on a violation of this subsection **or the regulations prescribed under this subsection** to enjoin such violation,
>
> (B) an action to recover for actual monetary loss **from such a violation,** or to receive $500 in damages for each such violation, whichever is greater, or
>
> (C) both such actions.

(emphasis added). The Court also notes that the private right of action provides a mandatory minimum of $500 liquidated damages for "each such violation." This indicates that a facsimile advertisement sent in violation of the statute's proscriptions, which also fails to include the mandatory disclosures of date and time required by these regulations, would constitute two distinct violations, and subject to $500 liquidated damages for each violation. This is a common concept in the law, often addressed by the "Blockburger rule," after *Blockburger v. United States*, 284 U.S. 299 (1932). "The appropriate inquiry under *Blockburger* is 'whether each provision requires proof of a fact which the other does not.'" *Ball v. United States*, 470 U.S. 856 (1985). *See Sanchez v. Overmyer*, 891 F.Supp. 1253, 1260 (N.D. Ohio 1995) (application of *Blockburger* rule to individual clauses in a statute); *Lovgren v. Byrne*, 787 F.2d 857, 863 (3rd Cir. 1986) (application of *Blockburger* rule to violation of regulations).

> [FN1] Plaintiff informed the Court at the hearing that a typographical error in the Petition incorrectly identified the section of the regulations as 47 C.F.R. 68.318(c)(3), which should have been 47 C.F.R. 68.318(d). The Court

permits this technical amendment to the Petition.

[☞4] Moreover, it seems abundantly clear that a fax that violates both the statute and the identification requirements of the regulations is "worse" than a fax that only violates only a single proscription. An instructive treatment of this issue is found in *FAA v. Landy*, 705 F.2d 624 (2d Cir. 1983):

> The regulatory scheme at issue here clearly states discrete harms. A person who complies with some of the manual requirements, for example, but fails to furnish a copy to the FAA, is subject to a fine for that one discrete violation. It would be anomalous to reward the person who totally ignores the manual requirements by concluding that he, too, is subject to but a single fine when he simultaneously violates several regulations. Other juries have found multiple violations. *See, e.g., United States v. Lockheed L-188 Aircraft*, 656 F.2d 390, 393 (9th Cir.1979) ($165,000 in fines for 552 separate violations of Part 121 regulations).

*Id.* at 636. [☞5] Consumers have a right to be free from unsolicited advertising faxes ,and they also have a right to receive proper identification on all faxes. A consumer who receives a call or fax violating multiple rights provided under the TCPA should recover for each right violated. [☞6] This construction is reinforced by the fact that the TCPA is a remedial consumer protection statute and "should be liberally construed and interpreted (when that is possible) in a manner tending to discourage attempted evasions by wrongdoers." *Scarborough v. Atlantic Coast Line R. Co.*, 178 F.2d 253, 258 (4th Cir. 1950). This principle is restated in the very first paragraph of the Missouri Revised Statutes, RSMo.§ 1.010, that "all acts of the general assembly, or laws, shall be liberally construed, so as to effectuate the true intent and meaning thereof" and this Court has applied that very principle in recent TCPA cases. *See Davis, Keller, Wiggins, LLC. v. JTH Tax, Inc.*, No. 00AC-023289 (Div. 39, Mo. Cir. Ct. Aug. 28, 2001).

## IV. Injunctive Relief

Defendant also argues that injunctive relief would be "unprecedented" and bases this argument on a claim that Defendant has not violated the statute. Defendant is complaining about a potential injunction that would prohibit it from violating a statute, that Defendant claims it is in fact not violating. Such a claim is inconsistent.

> It is equally true that it is inconsonant for this defendant, on the one hand, to protest so earnestly its desire to comply with the provisions of the act in the future, and, on the other hand, to contest so vehemently the granting of an injunction which can have no effect unless some provision of the act is in fact violated in the future. As was said in the case of *Fleming v. Tidewater Optical Co.*, D.C. Va., 35 F.Supp. 1015, 1017: "If the defendant in good faith hereafter complies with the Act, the injunction need not affect it; if it violates the provisions of the Act, the Administrator will not have to institute a new suit in order to obtain appropriate relief.'"

*Walling v. Builders' Veneer & Woodwork Co.*, 45 F.Supp. 808, 811 (D.C. Wis. 1942). [☞7] If Plaintiff proves a violation of the statute, he will be entitled to an injunction:

> Where an injunction is authorized by statute to protect the public interest, it is enough if the statutory conditions are satisfied and it is not necessary to show that irreparable injury will result. If the statutory conditions for injunctive relief are made apparent, the injunction issues without further considerations.

*Bowles v. Swift & Co.*, 56 F. Supp. 679, 680-681 (D.C. Del. 1944).

## CONCLUSION

Defendant's motion is granted with respect to Plaintiff's cause of action for violation of 47 U.S.C. § 227(d). In all other respects, Defendant's motion is DENIED.

**SO ORDERED.**

This the 18th day of December, 2001.

/s/ Patrick Clifford

Judge Patrick Clifford, Division 39

# # #

# EXHIBIT C

Robert D. Blau
Blau & Blau
55 Morris Avenue
Springfield, New Jersey 07081
973-564-9003

Sterling Realty Company,                           **SUPERIOR COURT OF NEW JERSEY**
Korinos Village Inc,
Skyl-tech Inc,                                              **LAW DIVISION**
Sebro packaging Inc,                                   **Special Civil Part**

Plaintiffs
                                                                **MIDDLESEX COUNTY**
v.
                                          **FILED**          Docket No.DC-010870-04
Richard Paul Klein,                    **MAR 2 1 2005**      **CIVIL ACTION**
John Does(1-10),
ABC Corporations
                                                                **ORDER OF JUDGMENT**
Defendants.

This matter was heard by the court on October 20, 2004 and after briefing by both parties
decided by the court in an oral decision on January 3, 2005.

## FINDINGS OF FACT

The relevant facts are essential undisputed. Plaintiffs are four businesses that brought suit
under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq., for the
transmission of seven unsolicited fax advertisements they received in 2004. Copies of the
faxes are before the court. All of the faxes advertise defendant's services related to group
medical insurance. Sterling Realty Co. ("Sterling") received one fax. Sebro Packing Inc.
("Sebro") received one fax. Korinos Village Inc ("Korinos") received two faxes. Skyl-tech
Inc. ("Skyl-tech") received three faxes. The two faxes received by Korinos and two of the
three faxes received by Skyl-tech do not contain a "header" or other identification of the
sender of the faxes or when they were sent. Plaintiffs had all at one time or another,
published advertisements or web sites that included their addresses and fax numbers.

Defendant Klein admits he sent these or similar faxes to Sterling and Sebro and does not deny
that he sent the similar faxes received by Korinos and Skyl-tech. Klein testified he obtained
addresses and fax numbers of Plaintiffs from advertisements and his practice was to send out
mailings promoting his business and then follow up those mailings with faxes.

## CONCLUSIONS OF LAW

This TCPA is a relatively simple statute enacted in 1991 which makes it illegal "to use any
telephone facsimile machine, computer, or other device to send an unsolicited advertisement
to a telephone  facsimile machine." 47 U.S.C. § 227(b)(1)(C). "Unsolicited advertisement" is
defined by the statute as "any material advertising the commercial availability or quality of
any property, goods, or services which is transmitted to any person without that person's prior
express invitation or permission." 47 U.S.C. § 227(a)(4). As a result, the only way faxes can

be sent is if the faxes do not contain any material advertising the commercial availability or quality of any property, goods, or services, or if they are sent with the prior express permission or invitation of the recipient. An advertiser has the burden of proof that it obtained express permission or invitation to send advertising faxes. Jemiola v. XYZ Corp., 802 N.E.2d 745 (Ohio C.P. Dec. 2003). Regulations promulgated under the statute by the Federal Communications Commission ("FCC") require that all faxes must include "the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual." 47 C.F.R. § 68.318. The TCPA provides a private right of action "to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater" plus injunctive relief. 47 U.S.C. § 227(b)(3). Plaintiffs do not seek actual damages under the TCPA. In addition, Plaintiffs claim that Defendant's acts violate the New Jersey Consumer Fraud Act. N.J.S.A. 56:8-2.

Defendant has raised a number of legal arguments positing that the TCPA does not apply to these faxes and that Plaintiff's consented to the faxes at issue. Finding that there is no dispute to the material facts and only questions of law remaining, the Court finds this matter ripe for summary judgment.

## DISCUSSION

### Established Business Relationship

Defendant argues that the existence of an "established business relationship" constitutes an exemption to the TCPA's provision covering unsolicited faxes. At one time, the FCC stated that "facsimile transmission [sic] from persons or entities who have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient." See 7 F.C.C.R. 8752, n.87, 1992 WL 690928 (1992). However, such an exemption is not supported by the plain language of the statute. As the Texas Court of Appeals noted, "deeming permission is based on an inference and, as such, seems to conflict with the TCPAs requirement that the invitation or permission be express. Characterizing permission granted by implication as 'express' runs afoul of the plain meaning of the word." Chair King, Inc. v. GTE Mobilenet of Houston, 135 S.W.3d 365 (Tex. App., May 2004). Other courts considering this question have universally reached the same conclusion. See, e.g., Jemiola v. XYZ Corp., 802 N.E.2d 745 (Ohio C.P. 2003); Schumacher Fin. Svcs., Inc. v. Nat'l Fed'n of Ind. Bus., 2003 TCPA Rep. 1088 (Mo. Cir. July 3, 2003); Penzer v. MSI Mktng., Inc., d/b/a Y2Marketing, 2003 TCPA Rep. 1142 (Fla. Cir. Apr. 2, 2003).

### Public Release of Fax Numbers

Defendant argues that Plaintiffs have publicly released their respective fax numbers and that constitutes an invitation to send faxed advertisements to those numbers. This interpretation conflicts with the statute's plain language that permission or invitation to send faxed ads must be "express" and has been explicitly rejected by the courts and the FCC. Similarly the fact that a plaintiff had given a business card to Mr. Klein and asked him to "stay in touch" does not constitute "express" consent to send advertising faxes.

**Lack of Header**

The two faxes received by Korinos and Skyl-tech specifically did not set forth who sent them or when they were sent. This implicates the portion of the TCPA regarding the FCC rules requiring all faxes to have such information. It is the sender's obligation to place the header on the fax, and if not, that is a separate violation of the act. The Court finds that two faxes did not have the required information and this is a separate violation of the Act.

**Willful or Knowing Violations**

The TCPA gives a court the discretion to treble the liquidated damages of $500 per violation if the court determines the violations were wither "willful" or "knowing." 47 U.S.C. § 227(b)(3). These terms have well established meanings when used in the Act and do not require any specific intent to violate the statute. "Willful" is defined as "the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this chapter or any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States." 47 U.S.C. § 312(f). "Knowingly" has long been construed as used throughout the 1934 Communications Act as "knew or should have known" standard. "the 'knowingly' standard only requires that a person either had reason to know or should have known that it engaged in acts which could constitute a violation of the statute." <u>Intercambio, Inc.</u>, 3 FCC Rec. 7247 at ¶41, 1988 WL 486783 (F.C.C).

The Court finds that Defendant's acts were both willful and knowing as those terms are used in the Act, but the Court exercises its discretion and declines to increase the damages.

**New Jersey Consumer Fraud Act Claims**

Plaintiff argues that sending unsolicited fax advertisements in violation of the TCPA is an "unconscionable commercial practice" in violation of the Consumer Fraud Act. N.J.S.A. 56:8-2. While a regulatory violation "can serve as evidence of unconscionable practices under the Consumer Fraud Act," <u>Lemelledo v. Beneficial Management Corp.</u>, 289 N.J. Super. 489, 502 (App. Div. 1996), the Court does not find that the conduct of Defendant here rises to the level of such an unconscionable practice.

## CONCLUSION

Having considered all the arguments and evidence, the Court holds that the seven faxes at issue were sent by Defedant and constitute material advertising the commercial avaiability of any property goods or services, specifically defendant's services related to group medical insurance. The Court further holds that Defendant did not obtain prior express permission or invitation to sent the faxes at issue to any Plaintiff. The four faxes sent without the proper identification of the sender and time of transmission constitute four additional violations of the statute.

In summary, the Court finds that Defendant's faxes constitute a total of ten (10) violations of the TCPA and awards judgment to Plaintiffs of five thousand dollars ($5, 500) representing $500 for each violation as follows:

$500.00 .........to Sterling Realty Co.
$500.00 .........to Sebro Packing Inc.
$2,000.00 ......to Korinos Village Inc.
$2,500.00 ......to Skyl-tech Inc

Judgment in favor of Defendant is entered as to Plaintiff's claims under the New Jersey Consumer Fraud Act.

IT IS SO ORDERED, this the ___21___ day of March , 2005.

_____
Frank M. Ciuffani, JSC

**FILED**

MAR 2 1 2005

Frank M. Ciuffani, JSC

# EXHIBIT D

# J O U R N A L

OF THE

# HOUSE OF REPRESENTATIVES

OF

# The Commonwealth of Massachusetts

# 2002

PRINTED BY ORDER OF THE HOUSE AND IN ACCORDANCE WITH THE
PROVISIONS OF SECTION 10 OF CHAPTER 5 OF THE
GENERAL LAWS.



**BOSTON**
**EAGLE GRAPHICS, INC., LEGISLATIVE PRINTERS**
**30 LANCASTER STREET**
**2002**

TUESDAY, JULY 23, 2002.                    2033

Authorizing the city of Lowell to pay a certain unpaid bill (House, No. 5112); and

Relative to voting precincts for the city of Chicopee (House, No. 5178) (its title having been changed by the committee on Bills in the Third Reading);

Severally reported by said committee to be correctly drawn, were read a third time; and they were passed to be engrossed. Severally sent to the Senate for concurrence.

---

The engrossed Bill relative to a certain employee of the Division of Industrial Accidents (see Sena, No. 4418, amended), having been returned by Her Honor the Lieutenant-Governor, Acting Governor, with her objections thereto in writing (for message, see House, No. 5267), was considered.

*Francis X. Sena,— employment.*

Pending the question on passing the bill, notwithstanding the said objections, further consideration thereof was postponed, on motion of Mr. Jones of North Reading, until Thursday, August 15, 2002.

The engrossed Bill enhancing state revenues (see House, No. 5250), which had been returned to the House by Her Honor the Lieutenant-Governor, Acting Governor, with her objections thereto in writing (for message, see House, No. 5269), was considered.

*State revenues,— enhance.*

After debate (Mr. Petrolati of Ludlow being in the Chair) the question on passing the bill, notwithstanding the said objections, was determined by yeas and nays, as required by Chapter I, Section I, Article II, of the Constitution; and on the roll call 122 members voted in the affirmative and 29 in the negative.

*Bill passed over veto,— yea and nay No. 412.*

**[See Yea and Nay No. 412 in Supplement.]**

Therefore the bill was passed, notwithstanding the said objections of the Acting Governor (more than two-thirds of the members having agreed to pass the same). Sent to the Senate for its action.

Mr. DiMasi of Boston being in the Chair,—

The House Bill regulating telemarketing solicitation (House, No. 5225), reported by the committee on Bills in the Third Reading to be correctly drawn, was read a third time.

*Telemarketing solicitation.*

After debate on the question on passing the bill to be engrossed, Messrs. Buoniconti of West Springfield and Ruane of Salem moved that it be amended in section 10, in line 5 (as printed), by inserting after the word "violation" the following: "but not less than $1,500.00 for a knowing violation involving a consumer 65 years of age or older".

After remarks the amendment was adopted.

Mr. Miceli of Wilmington then moved that the bill be amended in section 4, in lines 5 to 12, inclusive (as printed), by striking out the following: ", unless (A) such call was made by a telephone solicitor that first began doing business in the commonwealth on or after January 1, 2002, (B) a period of less than one year has passed since such telephone solicitor first began doing business in the commonwealth, and (C) the consumer to which such call was made had not on a previous occasion stated to such telephone solicitor that such

**Telemarketing solicitation.**

consumer no longer wishes to receive the telephonic sales calls of such telephone solicitor".

After remarks the amendment was adopted.

Mr. Straus of Mattapoisett then moved that the bill be amended in section 3, in line 17 (as printed), by inserting after the word "request" the words "or in any other such manner and at such times as the division may prescribe which may include electronic notification"; and the amendment was adopted.

Mr. Rogers of Norwood then moved that the bill be amended in section 2, in line 20 (as printed), by striking out the figures "12" and inserting in place thereof the figures "24"; and the amendment was adopted.

Mr. Broadhurst of Methuen then moved that the bill be amended in section 2 (as printed), in line 47, by striking out the word "or", and, in line 50, by inserting after the word "solicitor" the following: "; or (D) in which the sale of goods and services is not completed, and payment or authorization of payment is not required, until after a face-to-face sales presentation by the telephone solicitor or a meeting between the telephone solicitor and customer". The amendments were adopted.

Mr. Fallon of Malden then moved that the bill be amended in section 12 (as printed), in line 3 and also in line 6, by striking out the word "two" and inserting in place thereof, in each instance, the word "three"; and the amendment was adopted.

Mr. Miceli of Wilmington then moved that the bill (as printed) be amended in section 2, in lines 12 and 13, by striking out the paragraph contained therein, and by inserting after line 31 the following paragraph:

"'Office', means the Office of Consumer Affairs and Business Regulation;"; and in section 3, in lines 1, 3, 10, 13, 14, 17 and 19; in section 4, in line 5; in section 6, in line 12; in section 7, in lines 1, 4, 7 and 18; in section 8, in line 4; and in section 16, in lines 1, 6, 9 (both times it appears) and 12, by striking out the word "division" and inserting in place thereof, in each instance, the word "office".

After remarks the amendments were adopted.

**Bill passed to be engrossed,— yea and nay No. 413.**

On the question on passing the bill, as amended, to be engrossed, the sense of the House was taken by yeas and nays, at the request of Mr. Greene of Billerica; and on the roll call 148 members voted in the affirmative and 0 in the negative.

**[See Yea and Nay No. 413 in Supplement.]**

Therefore the bill (House, No. 5225, amended) was passed to be engrossed. Sent to the Senate for concurrence.

*Engrossed Bill — Land Taking.*

**Arlington,— public way.**

The engrossed Bill authorizing the town of Arlington to use a certain parcel of park land for public way purposes (see Senate, No. 2023) (which originated in the Senate), having been certified by the Clerk to be rightly and truly prepared for final passage, was put upon its final passage.

**Bill enacted (land taking),— yea and nay No. 414.**

On the question on passing the bill to be enacted, the sense of the House was taken by yeas and nays (this being a bill providing for the taking of land or other easements used for conservation pur-

# EXHIBIT E

Case 1:05-cv-11545-NG · · Document 23-2 · · Filed 09/06/2005 · · Page 26 of 32

**HOUSE SESSION – TUESDAY, JULY 23, 2002**

Rep. T. O'Brien said I bring a few new points to you now. I don't want anyone here in the House or this state to lose sight of these. Without the leadership of House Speaker Finneran, we would not have accrued more than $2 billion in reserves. Many colleagues pilloried his attempt to build up our reserves. We must not forget the more than $4 billion in tax cuts we have passed over 8 years. Our memory cannot be shortened. Many of the tax cuts originated in this House. We have cut the budget this year. We cut the funding for district attorney's jails and others. This vote is potentially dire. For those who say this budget is too big and we need more cuts, that seems fair. But I take a different position. We should override the veto and not cut more than $1 billion in spending. My towns tell me that one thing we must focus on is local aid. We must do what we can to return the money to them. I do not want to see another $1 billion cut from this budget. Therefore, I will vote to override the governor's veto.

Rep. Frost said this is a chance to rant and rave before this is a done deal. We've been told why we should vote for the largest tax hike in state history. The governor tells us there are alternatives but you rejected them in April and May. There's an old saying: the road to Hell is paved with good intentions. This tax package is the road to Hell for our constituents, our taxpayers and our communities.

Rep. Marini said this is a good debate. We passed this tax plan with 131 votes, and then again with fewer ayes. So what compels everyone here to get up and defend his or her position? We here in the House are convinced. Who are they trying to convince? It's either themselves or the constituents. This override will pass but it's the wrong thing to do. it takes courage to say we don't have the money and can't do everything we want to do. I see rough seas ahead. We actually increased spending in the budget. I fear we also overestimate how much revenue this tax plan will raise. We may have to cut more next year. We are setting ourselves and the people up for a fall. It is mistaken. I try to say this calmly, and not rant and rave. Please heed Her Excellency's advice. Don't embrace a short-term solution to a long-term problem. I urge you to sustain the veto.

Rep. Gomes said when the tax plan was before us, I voted for it. We tried to amend it, but couldn't. I hoped we could divide the package and look at the taxes one-by-one. My one vote was not needed. But I believed in these times we need to look at additional revenue. I wanted to look at each tax separately. I thought it was just the beginning of the process. Some of the taxes are offensive for my district. I will now vote to sustain the governor's veto and I ask you to join me. These are tough times, but we should have considered other options. Many of my towns don't like the retroactive capital gains tax date. They are offended by that. I believe that as leaders we must respond to this problem. Taxes may play a part, but this is a bigger package than the one I voted for before. I don't like the capital gains tax effective date. My vote will be different today. Now you know why I hope to sustain the veto.

**GOV'S VETO OF TAX HIKE OVERRIDDEN ON ROLL CALL VOTE OF 117-29**

Rep. DiMasi took the gavel.

**TELEMARKETING:** Question came on engrossment of H 5225 regulating telemarketing solicitation.

Rep. Greene said this may well be the best consumer bill passed in two years. Each night, we are interrupted by ringing phones. You don't know who it's from. You are asked to buy some product, during your supper break. You sit down and the same thing happens again and again. This bill should eliminate about 90 percent of those calls, if a consumer wants. You can be added to a no-call list maintained by the Secretary of State's office. This will cost nothing. Anyone who wishes to telemarket must buy this list and must not call people on it.

-more-

HOUSE SESSION – TUESDAY, JULY 23, 2002

Rep. Greene continued: Also in this bill, they can't block caller ID. Violators can be fined up to $5,000. It's hard in this bill not to hurt business. We exempt some nonprofits. We think this bill will go a long way to returning peace and tranquility to our homes. The House backs this bill. I thank the 65 House members that signed onto this. This bill mirrors a bill passed in the state of Connecticut. Over 700,000 have signed up for the list in that state. A constituent emailed me about this bill. He urged me to support this list. He called telemarketers an invasion of our homes, our castles. He said it was time for us to step in with reasonable but firm legislation. That is what we have here.

Rep. Straus said I too support this. I want to thank Rep. Greene for his work here. I have filed these bills starting six years ago. Many states have passed similar bills. I, like you, am plagued by these calls. You don't want them, but they keep coming. This bill is the only way to stop the calls. If they like to be bothered at home, they don't have to do anything. I promise them the calls will keep coming. I support the amendment that transfers enforcement from the attorney general to the secretary of state. I urge support for this bill.

Rep. Miceli said there were many bills filed in a similar vein, many bills that address this situation. I filed one last November after receiving a call from one of my constituents. He said this should be addressed by the Legislature. The problems are you're getting calls when you're getting ready to sit down and eat, and other calls that are just nuisances. I filed the bill and had an overwhelming number of cosponsors in this House. The newspapers picked it up and ran an editorial in my local newspapers. I received 90 calls of support on the legislation. This is a really hot item. This is probably the most important piece of consumer protection legislation you'll vote for this year. The Speaker has made this bill one of his priorities. It would get rid of these nuisance calls. It's a great bill. I support it. Authorship is not important. I urge you to vote for this legislation. Members applauded.

SEVEN AMENDMENTS ADOPTED: Rep. Buoniconti offered an amendment changing the amount of fines for calling seniors on do not call lists.

Rep. Buoniconti said although this is an issue that touches everybody, I thought it dealt mostly with seniors. This amendment would make it a harsher penalty to any company that calls seniors over the age of 65 on do not call lists.

The House adopted the amendment.

Rep. Miceli offered an amendment relative to the start date of certain businesses.

Rep. Miceli said all this does is eliminate a loophole in the bill that would have grandfathered coverage to startup companies. This exempts that loophole.

The House adopted the amendment on voice vote.

The House adopted an amendment offered by Rep. Straus offered relative to written requests.

The House adopted an amendment offered by Rep. J. Rogers changing the figure 12 to 24 in a certain section.

The House adopted an amendment offered by Rep. Broadhurst.

-more-

**HOUSE SESSION – TUESDAY, JULY 23, 2002**

The House adopted an amendment offered by Rep. Fallon changing a certain figure from 2 to 3.

Question came on a Miceli amendment adding language relative to the office of consumer affairs.

Rep. Miceli said this transfers some authority to the consumer affairs office but keeps prosecution powers with the attorney general.

The House adopted the amendment.

**PASSING THE BILL:** Question came again on engrossing the bill.  Rep. Greene requested a roll call vote and there was support.

**BILL ENGROSSED ON ROLL CALL VOTE OF 148-0**

**ARLINGTON:** The House, on a constitutionally required roll call, voted 145-0 to enact authorizing Arlington to use certain parcels of parkland.

**LOWELL:** The House engrossed H 5112 authorizing Lowell to pay a certain unpaid bill.

**ECSTASY:** The House ordered to third reading H 1726 relative to the penalties for distribution of methylenedioxy methamphetamine.

**WEYMOUTH:** The House concurred with Senate changes to H 4012 enhanced emergency telephone system in Weymouth.

**HANDICAPPED BIKERS:** The House concurred with Senate changes to H 4099 to issue a certain sticker to handicapped owners of motorcycles.

**WESTBOROUGH:** The House concurred with Senate changes to H 4844 authorizing the Division of Capital Asset Management and Maintenance to convey certain land in Westborough.

-more-

Serving the working press since 1910

# EXHIBIT F

𝔗𝔥𝔢 𝔠𝔬𝔪𝔪𝔬𝔫𝔴𝔢𝔞𝔩𝔱𝔥 𝔬𝔣 𝔐𝔞𝔰𝔰𝔞𝔠𝔥𝔲𝔰𝔢𝔱𝔱𝔰

THE

# JOURNAL OF THE SENATE

OF THE YEAR

## 2002

PRINTED BY ORDER OF THE SENATE AND IN ACCORDANCE WITH THE
PROVISIONS OF SECTION 10 OF CHAPTER 5 OF THE
GENERAL LAWS



BOSTON
EAGLE GRAPHICS, INC., LEGISLATIVE PRINTERS
30 LANCASTER STREET
2002

The yeas and nays having been completed at twenty-eight minutes before six o'clock P.M., the bill was passed to be enacted and it was signed by the Acting President and laid before the Acting Governor for her approbation.

### Reports of a Committee.

By Mr. Montigny, for the committee on Ways and Means, that the House Bill relative to insurance assessments (House, No. 5215),— ought to pass.

Insurance assessments.

There being no objection, the rules were suspended, on motion of Mr. Nuciforo, and the bill was read a second time, ordered to a third reading and read a third time.

After remarks, the question on passing the bill to be engrossed, in concurrence, was determined by a call of the yeas and nays, at twenty-four minutes before six o'clock P.M., on motion of Mr. Lees, as follows, to wit (yeas 38 — nays 0):

YEAS.

| | |
|---|---|
| Antonioni, Robert A. | Menard, Joan M. |
| Baddour, Steven A. | Montigny, Mark C. |
| Berry, Frederick E. | Moore, Richard T. |
| Brewer, Stephen M. | Morrissey, Michael W. |
| Chandler, Harriette L. | Murray, Therese |
| Creedon, Robert S., Jr. | Nuciforo, Andrea F., Jr. |
| Creem, Cynthia Stone | O'Leary, Robert A. |
| Fargo, Susan C. | Pacheco, Marc R. |
| Glodis, Guy W. | Panagiotakos, Steven C. |
| Hart, John A., Jr. | Resor, Pamela |
| Havern, Robert A. | Rosenberg, Stanley C. |
| Hedlund, Robert L. | Shannon, Charles E. |
| Jacques, Cheryl A. | Sprague, Jo Ann |
| Joyce, Brian A. | Tarr, Bruce E. |
| Knapik, Michael R. | Tisei, Richard R. |
| Lees, Brian P. | Tolman, Steven A. |
| Magnani, David P. | Tucker, Susan C. |
| McGee, Thomas M. | Walsh, Marian |
| Melconian, Linda J. | Wilkerson, Dianne — 38. |

NAYS — 0.

ABSENT OR NOT VOTING.

Travaglini, Robert E. — 1.

The yeas and nays having been completed at twenty minutes before six o'clock P.M., the bill was passed to be engrossed, in concurrence.

By Mr. Montigny, for the committee on Ways and Means, that the House Bill regulating telemarketing solicitation (House, No. 5225),— ought to pass.

Telemarketing solicitation.

There being no objection, the rules were suspended, on motion of Ms. Jacques, and the bill was read a second time.

Case 1:05-cv-11545-NG    Document 23-2    Filed 09/06/2005    Page 32 of 32

**Telemarketing
solicitation.**

Pending the main question on ordering the bill to a third readin
Messrs. Pacheco, Magnani and Tolman, Ms. Jacques, Messrs. Berr
Antonioni, Tisei, Knapik, Montigny and Tarr moved that the bill
amended by striking out all after the enacting clause and inserting
place thereof the text of Senate document numbered 2445.

After remarks, the question on adoption of the amendment w
determined by a call of the yeas and nays, at sixteen minutes past s
o'clock P.M., on motion of Mr. Pacheco, as follows, to wit (yeas 39
nays 0):

YEAS.

| | |
|---|---|
| Antonioni, Robert A. | Montigny, Mark C. |
| Baddour, Steven A. | Moore, Richard T. |
| Berry, Frederick E. | Morrissey, Michael W. |
| Brewer, Stephen M. | Murray, Therese |
| Chandler, Harriette L. | Nuciforo, Andrea F., Jr. |
| Creedon, Robert S., Jr. | O'Leary, Robert A. |
| Creem, Cynthia Stone | Pacheco, Marc R. |
| Fargo, Susan C. | Panagiotakos, Steven C. |
| Glodis, Guy W. | Resor, Pamela |
| Hart, John A., Jr. | Rosenberg, Stanley C. |
| Havern, Robert A. | Shannon, Charles E. |
| Hedlund, Robert L. | Sprague, Jo Ann |
| Jacques, Cheryl A. | Tarr, Bruce E. |
| Joyce, Brian A. | Tisei, Richard R. |
| Knapik, Michael R. | Tolman, Steven A. |
| Lees, Brian P. | Travaglini, Robert E. |
| Magnani, David P. | Tucker, Susan C. |
| McGee, Thomas M. | Walsh, Marian |
| Melconian, Linda J. | Wilkerson, Dianne — 39. |
| Menard, Joan M. | |

NAYS — 0.

**The yeas and nays having been completed at twenty minutes
past six o'clock P.M., the amendment was adopted.**

**The bill, as amended, was then ordered to a third reading, read
a third time and passed to be engrossed, in concurrence, with the
amendment.**

**Sent to the House for concurrence in the amendment.**

*Matter Taken Out of the Notice Section of the Calendar.*

There being no objection, the following matter was taken out of
the Notice Section of the Calendar and considered, as follows:

**Westford
Convenience
Store.**

The House Bill authorizing the town of Westford to issue an
additional license for the sale of all alcoholic beverages not to be
drunk on the premises (House, No. 5130),— **was read a third time
and passed to be engrossed, in concurrence.**

PAPERS FROM THE HOUSE.

**Canton,—
appoint
officers.**

A Bill authorizing the town of Canton to appoint police officers
(House, No. 5096,— on petition) [Local approval received],— was
read.